**In re SUN GLO COAL COMPANY, INC., Trojan Mining and Processing, Inc., Debtors.**

**Bankruptcy Nos. 92–70014, 92–70015.**

United States Bankruptcy Court,
E.D. Kentucky,
Pikeville Division.

July 29, 1992.

James Ratliff, Pikeville, Ky., and John Rollins, Charleston, W.Va., for debtors.

James Hampton, Hazard, Ky., for United Mine Workers of America, Local 1468 and Local 5741.

Barbara Locklin–George, Washington, D.C., and Bruce Levy, Pikeville, Ky., for UMWA Health and Retirement Funds.

## MEMORANDUM OPINION

WILLIAM S. HOWARD, Bankruptcy Judge.

This matter is before the Court on the Motion of Debtors for Authority to Reject Collective Bargaining Agreement and for Other Relief pursuant to 11 U.S.C. § 1113, filed herein on May 1, 1992. An evidentiary hearing in this matter was conducted on June 29, 1992, and continued to its conclusion on July 6, 1992. The debtors, the United Mine Workers of America, and the UMWA Health and Retirement Funds participated. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b); it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

The record herein indicates that the debtors are each signatory to a collective bargaining agreement, the National Bituminous Coal Wage Agreement of 1988 ("NBCWA" or "Wage Agreement"), with the United Mine Workers of America, which has been in force at all times relevant herein. The Wage Agreement provides the material terms of the wages, benefits and work rules regarding the debtors and their employees, together with the benefits related to former employees and retirees. The debtors are parties to the Wage Agreement which was negotiated by the Bituminous Coal Operators Association ("BCOA"), the body that entered into collective bargaining with the United Mine Workers of America to produce the Wage Agreement.

The debtors filed their Chapter 11 petitions in this Court on January 7, 1992. Debtor Trojan Mining and Processing, Inc. ("Trojan") is an affiliate of debtor Sun Glo Coal Company, Inc. ("Sun Glo"). Trojan has employed upwards of 180 people in the mining and processing of coal, and has furnished a labor force to Sun Glo at all times relevant hereto. On the date of filing of the petitions the debtors also filed a Motion for Authority to Impose Interim Modifications to the Collective Bargaining

Agreement and Other Relief. This Court considered that Motion on January 10, 1992, and on January 14, 1992, entered an Order based on Findings of Fact and Conclusions of Law granting the requested relief in part. An Order Approving Joint Administration was entered on February 12, 1992.

The debtors and the International Union, United Mine Workers, and Locals 5741 and 1468 UMWA ("the Union") memorialized a Joint Stipulation in regard to the Motion under consideration here. The UMWA Health and Retirement Funds ("the Funds") did not participate in the formulation of the Stipulation although, at the hearing on this matter, the Funds joined in the Stipulation. The Stipulation was tendered to the Court on the date of hearing. It provides in pertinent part as follows (items dealing with the attachment of exhibits and copies are omitted):

1. Subsequent to the filing of the Petition herein and prior to filing the application seeking rejection of the Collective Bargaining Agreement, the Debtors have made proposals to the UMWA, the authorized representative of the employees, which sought modifications in the employees' benefits under the contract.

4. The Debtor has provided relevant information necessary to evaluate the proposals. Further, the Debtor has offered to make all of its books and records available to the representative and has not refused to respond to any requests for information from the representative, except the Debtors have advised that they do not know the price for which the coal they produce is sold or the profit margin.

5. The Debtors have met at reasonable times after making the proposals with the authorized representative to confer regarding the proposals.

6. Prior to the hearing, the authorized representative has not accepted any of the proposals as a total package, although the UMWA representative has advised that some portions of the proposals were acceptable subject to an entire agreement being reached.

At the evidentiary hearing conducted on June 29, 1992, Don Wallen, a CPA, testified on behalf of the debtors. He stated that Trojan had a taxable income of $9,038.00 in 1991, while Sun Glo showed a loss of $514,-043.00. Compilations for January through May, 1992, showed a cumulative loss of $1,500,000.00. Of this figure, $758,000.00 was a prior period entry, and therefore the actual monetary loss as of May 31 was approximately $740,000.00. By month the figures are as follows:

| | |
|---|---|
| January 31: | − $644,000.00 |
| February 29: | − $341,000.00 |
| March 31: | + $679,391.00 |
| April 30: | − $ 55,172.00 |
| May 31: | − $392,092.00 |
| Total | − $752,873.00 |

Although these losses will be subject to some adjustment, it is evident that the debtors will continue to suffer significant losses unless some drastic reductions in their costs occur. Costs are the major factor in these losses, and this Court finds that labor costs are the most significant of these costs.

According to the testimony of Tom Anderson, sole shareholder and director of the debtors, and their president, the debtors and the Union began a series of bargaining sessions regarding permanent changes in the Collective Bargaining Agreement on March 19, 1992. Prior to this meeting the debtors submitted a second proposal for modifications. The debtors presented a third modification to the Union on April 17, 1992. The session following that proposal took place on April 28, 1992, with another meeting taking place within a week or ten days of that session. At that time, the Union presented its response to the most recent proposal. The debtors then responded with a fourth proposal. Another meeting may have taken place after the fourth proposal was submitted, and a fifth proposal was submitted, but not in time for the Union to consider it before the evidentiary hearing in this matter. (Transcript of Hearing, pp. 78–80)

Testimony elicited from Mr. Anderson and other witnesses indicates that while the debtors and the Union have been able to achieve a certain degree of compromise

on various economic modifications such as wages and medical insurance benefits, issues such as seniority, employee discipline, and absenteeism have not been susceptible to such compromise. As set out in the parties' Joint Stipulation, they have not been able to come up with a "total package" acceptable to all sides. This Court posed the question of the court's authority to approve some modifications and not others.

The Union has responded that the provisions of 11 U.S.C. § 1113 which allow a bankruptcy judge to authorize rejection of collective bargaining agreements under certain circumstances do not permit "judicially-constructed" modifications of those agreements. It has cited several cases in support of its position, with language most directly addressing this issue found in *In re Russell Transfer*, 48 B.R. 241 (Bkrtcy. W.D.Va.1985). Therein the court stated:

> A reading of § 1113(e) clearly indicates a Congressional intent that relief under this sub-section shall be granted only as a means to avoid irreparable damage to the estate and permit the debtor to continue in business for the benefit of the debtors (sic), its creditors, and to provide jobs for its employees. The Congress did not intend that this Court undertake the rewriting on a permanent basis of collective bargaining agreements.

At page 243.

Another case which supports this view is *In re Sierra Steel Corp.*, 88 B.R. 314 (D.Colo.1987), in which a bankruptcy court's imposition of a "snap-back" provision into an employer's proposed alteration of a collective bargaining agreement was found to be error. This Court agrees with this view and finds that it may authorize the debtors' rejection of the collective bargaining agreement, or not, as the case may be, but that it may not create an agreement for the parties.

Consideration of the debtors' fourth proposal dated May 20, 1992, reveals that it contains nineteen items dealing with a variety of concerns including wages and other benefits, work rules, and other items not strictly economic in nature. The Union's response to this proposed modification is embodied in a letter dated May 26, 1992, from the Union's attorney to the debtors' attorney. The Union's response was that it was agreeable to paragraphs 1 (wages), 2 (overtime), 3 (vacation), 7 (Sunday operations), 8 (retraining), and 13 (management committee).

The Union did not agree with paragraph 4 which limits contractual paid leave days to six, but did agree to reduce the total number of possible accumulated vacation days from thirteen to eight. The Union was agreeable to the provision in paragraph 5 changing medical insurance to an 80/20 coinsurance plan with deductible. The Union would not agree with that part of the provision which limited coverage to active employees. The Union agreed to consider adoption of the changes in scheduling to allow outside travel time as provided in paragraph 9.

As to paragraphs 10 (idling) and 14 (job bidding freeze/temporary jobs), the Union agreed that the employers should have the right to produce coal on idled days without scheduling the entire work force where shipments are scheduled or coal storage needs require. It did not agree to the right to schedule crews for regular ten-hour shifts or other flex time. It agreed to a 180 day freeze on job bidding. It did not agree with the rest of this paragraph as regards certification, testing, and the determination of senior qualified bidders being in management's discretion, or with the elimination of temporary job bidding.

Paragraph 12 (layoff/recall) allows management a one-time work force reduction and recall without strict regard to seniority. This provision was rejected by the Union.

Paragraph 15 (supervisor work) was agreed to insofar as it authorized supervisors to perform classified work to correct any unsafe condition, providing it was limited to emergency situations where classified employees are not available. The remainder of the provision authorizing a supervisor to perform any task needed to return the mine or plant to production after a breakdown or when insufficient classified

employees come to work on any given day was rejected.

Paragraph 16 (attendance program) provides for the calculation of absenteeism on a monthly basis with absenteeism above the mine average rate for any three months resulting in suspension with intent to discharge. Medical absences are counted in the calculation, the "AWOL" program is eliminated, and leaving a shift early or arriving after the mantrip has left for the workface is counted as an absence. The Union rejected this provision, and agreed only to the establishment of a six member committee to review past customs and practices and prepare a recommended summary of continuing practices.

The Union agreed to the provisions of paragraph 18 (BCOA) dealing with modifications or extensions of the NBCWA. It did not agree however that this provision should apply to future modifications regarding the UMWA Pension Plan and Trust, or that future statutes or court decisions could not modify the NBCWA unless separately agreed to by the parties. The Union also agreed to paragraph 19 (interpretation) except that it proposed a three year extension rather than an expiration date of February 19, 1993.

The Union's response also stated that if it were provided with "reasonable and accurate" calculations of the cost savings of those portions of paragraphs 4, 5, and 11 to which the Union could not agree, that it would attempt to accommodate the economic concerns embodied in these provisions by a counterproposal in the form of establishment of a defined contribution pension plan. The Union's response further noted that the only provisions for which the debtors had provided cost analysis were paragraphs 1, 2, 4, 5, 6, and 9.

As stated above, the applicable Bankruptcy Code provision is 11 U.S.C. § 1113. In regard to the requirements of that section, courts have historically applied the nine-part test enunciated in *In re American Provision Co.*, 44 B.R. 907, 909 (Bkrtcy.D.Minn.1984):

1) The debtor in possession must have made a proposal to the union;

2) The proposal must be based on the most complete and reliable information available at the time of the proposal;

3) The modification must be necessary to permit reorganization;

4) The modification must provide that all affected parties are treated fairly and equitably;

5) The debtor must provide the union with such relevant information as is necessary to evaluate the proposal;

6) The debtor must have met with the collective bargaining representative at reasonable times subsequent to making the proposal;

7) The debtor must have negotiated with the union concerning the proposal in good faith;

8) The union must have refused to accept the proposal without good cause; and

9) The balance of the equities must clearly favor rejection of the agreement.

The requirements of items 1, 2, 5, and 6 have undoubtedly been met. The Union has raised the question of the debtors' good faith, but this court believes that the debtors have negotiated with the Union in good faith and that item 7 has also been satisfied. The issues remaining to be resolved are, therefore, those raised by items 3, 4, 8, and 9.

The issue of whether the modification is necessary for reorganization has historically caused courts the greatest problem in interpretation. The leading cases on this issue are *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America,* 791 F.2d 1074 (3rd Cir.1986) and *Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d 82 (2nd Cir. 1987). The Third Circuit in *Wheeling–Pittsburgh* interpreted "necessary" to mean "necessary to prevent liquidation". *Id.* at 1088. The Second Circuit in *Carey Transportation* held that "necessary" should be interpreted in the context of whether rejection would increase the likelihood of successful reorganization. The Union urges this Court to follow *Wheel-*

*ing–Pittsburgh;* the debtors line up behind *Carey Transportation.*

The Funds argue that since the debtors propose to modify or eliminate their retiree benefit obligation, the standard for rejection is the *Wheeling–Pittsburgh* standard codified in 11 U.S.C. § 1114. The Funds maintain that the legislative history of this section makes it clear that the *Carey Transportation* view is rejected and the *Wheeling–Pittsburgh* standard adopted. However, as is pointed out in 5 *Collier on Bankruptcy* ¶ 1114.02[5][a] (15th ed. 1992), this position was embodied only in the remarks of Sen. Metzenbaum and was not part of any Committee or Conference Report. Congress did not adopt one test or the other.

■ This Court is inclined to follow *Carey Transportation* in making a determination as to whether rejection of the collective bargaining agreement is necessary to the reorganization of the debtor. Since the debtors and the Union have agreed on many of the provisions of the debtors' fourth (May 20, 1992) proposal, this Court must then decide if the provisions which remain in contention are necessary to the debtors' reorganization, i.e., whether they increase the likelihood of successful reorganization. The evidence is indisputable that if these debtors do not receive major economic concessions they cannot continue in business. The question before the Court is whether the debtors have insisted on significant concessions that go beyond what is necessary to allow them to reorganize. The majority of these provisions, as set out above, have to do with work rules, layoffs, seniority, and benefits being provided to other than currently active workers.

The economic benefit to the debtors to be derived from ceasing to provide benefits to other than currently active workers is evident (and it is substantial) as is the desirability of a one time rearrangement of the workforce without regard to seniority, but as the Union points out, and the debtors have presented no testimony in contravention, the debtors have not done cost analysis for the other contested provisions. (Transcript of Hearing, pp. 29–30) They relied on what the Union has characterized as vague, unsubstantiated testimony from Dr. Ralph Barbaro, Trigg Combs, and Malcolm Poulter as to the cost savings that would be effected by the implementation of such measures. This Court tends to agree that the debtors have failed to sufficiently quantify the results of such proposed changes to allow this Court to find that they are "necessary" to the reorganization of the debtors.

The sum and substance of Dr. Barbaro's testimony was that loss of job security tends to result in an increase in productivity. Mr. Combs's testimony was not particularly supportive of the debtors' position in that he did not have significant knowledge of prevailing wage rates in Pike County, and Mr. Poulter gave what amounted to opinion testimony that implementing these measures would effect an increase in productivity of between fifteen and twenty percent. (Transcript of Hearing, pp. 40–97; 108–120; 12) This Court does not believe that the debtors have demonstrated that these measures are "necessary" to its reorganization, because they have not demonstrated how these particular changes will increase the likelihood of successful reorganization, aside from vague assertions that they will increase productivity.

As set out in § 1113(c), the Court may only approve an application for rejection if the trustee (debtor in possession) has made a proposal that fulfills the requirements of § 1113(b)(1), the authorized representative of the employees has refused to accept the proposal without good cause, and the balance of the equities favors rejection. This Court believes that the Union's response to the debtors' fourth proposal provides evidence that supports a finding that the Union did not refuse to accept the proposal without good cause.

The Union bargained in good faith and gave concessions in many areas, especially where the debtors could demonstrate what the cost savings of particular measures would be. It did not "stonewall", nor did it reject proposals out of hand because they would require some sacrifice on its part. This Court believes that the Union's objection to and rejection of the provisions dis-

cussed above are not grounded in obstinate attempts to thwart management efforts to improve productivity, but in its historical role as the guarantor of the working person's rights in the labor arena.

All of the foregoing tends to show as well that the balancing of the equities does not favor rejection and that the proposal does not treat all parties fairly and equitably. Clearly these debtors are on the brink of financial disaster but it appears that they sought concessions which went beyond those necessary to allow them to reorganize and that the Union did not act unreasonably in refusing these concessions.

It is therefore the opinion of this Court, based on all the considerations set out above, that the debtors Motion for Authority to Reject Collective Bargaining Agreement should be overruled. An order in conformity with this opinion will be entered separately.