**In re HORIZON NATURAL RESOURCES COMPANY, et al., Debtors.**

**No. 02–14261.**

United States Bankruptcy Court,
E.D. Kentucky,
Ashland Division.

Aug. 6, 2004.

---

Douglas L. Lutz, Cincinnati, OH, for Debtors.

Deborah Stern, Fairfax, VA, for United Mine Workers of America.

John R. Mooney, Washington, DC, for UMWA 1950 Benefit Plan and UMWA Combined Benefit Fund.

Paul A. Green, Washington, DC, for UMWA Pension Trust and UMWA 1974 Pension Trust.

### *MEMORANDUM OPINION*

#### I

On July 6, 2004 certain of the above-referenced debtors filed motions seeking to terminate collective bargaining agreements and to terminate or modify employee benefit plans (the "Motions"). Specifically, the ten debtors with union

operations (the "Union Debtors")[1] filed a Motion of Certain Debtors for Entry of an Order Authorizing Them to Reject Certain Collective Bargaining Agreements Pursuant to Section 1113 of the Bankruptcy Code; the Union Debtors, West Virginia–Indiana Coal Holding Company, Inc., and Ziegler Coal Holding Company filed a Motion of Certain Debtors for Entry of an Order Authorizing Them to Modify Certain Union Retiree Benefit Plans Pursuant to Section 1114 of the Bankruptcy Code; and the same twelve movants filed a Motion of Certain Debtors for Entry of an Order Authorizing Them to Modify Coal Act Union Retiree Benefit Plans Pursuant to Section 1114 of the Bankruptcy Code. The court has reviewed the Motions and supporting briefs, the joint stipulations of the parties, the responses and briefs filed by the United Mine Workers of America (the "Union") and the UMWA 1992 Benefit Plan (the "1992 Plan"), the UMWA Combined Benefit Fund (the "Combined Fund") and their trustees, and other parties in interest, heard the testimony of numerous witnesses and the arguments of counsel on July 20, 2004, and considered the exhibits admitted into evidence at that hearing, and now makes its findings of fact and conclusions of law pursuant to and in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, made applicable in bankruptcy contested matters by Rules 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure.

## II

The debtors are, taken together, one of the largest coal producers in the United States, mining and marketing primarily coal for steam generation. Eight of the Union Debtors are signatories to the National Bituminous Coal Wage Agreement of 2002, and the two other Union Debtors have separate collective bargaining agreements with the Union. Each of the collective bargaining agreements includes a "successorship clause," whereby the employer agreed not to sell its operation without obtaining the agreement of the purchaser to assume the employer's obligations under the agreement. The debtors employ approximately 2,500 individuals, about 800 of which are represented by the Union. Of the ten Union Debtors, only four have active mining operations.

On November 13 and 14, 2002 the debtors filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code" or the "Code"), commencing the above-styled cases. Initially, the debtors anticipated retaining their assets and reorganizing their business and financial affairs. Around the beginning of 2004, however, their focus changed to one of liquidating substantially all of their assets. The debtors have filed two Chapter 11 plans, both of which provide for the sale of the debtors' assets, with the buyers assuming obligations to reclaim the mine sites. The sale proceeds are to be used to satisfy or reduce obligations to the debtors' postpetition lenders, administrative expenses not assumed by the purchaser(s), and other secured and unsecured claims. Assets not part of the sale may be sold later by a reclamation agent with the buyer(s) assuming obligations to reclaim the mines, or those assets may be sold to generate funds to be used for reclamation. On June 16, 2004 the court entered an order approving sale procedures, which scheduled an auc-

---

1. The Union Debtors are Midwest Coal Corporation, Marrowbone Development Company, Princess Beverly Coal Company, Kindill Mining, Inc., Kanawha Corporation, Dunn Coal and Dock Company, Cannelton Industries, Inc., Old Ben Coal Company, Mountain Coals Corporation, and Beech Coal Company.

tion for August 17, 2004 and a hearing on approval of the sale for August 31, 2004. The plans seek an order authorizing the sale of the debtors' assets free and clear of all liens, claims, encumbrances, and other interests, apparently including successor liability under collective bargaining agreements and under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–22 (the "Coal Act"). On July 13 2004 the court entered an order approving the debtors' disclosure statement, which scheduled a hearing on confirmation of the plans for August 31, 2004.

### III

During August of 2003, the debtors submitted to the Union a series of proposals for modifications of the collective bargaining agreements and of employee benefits. The proposals requested changes to almost every article of each collective bargaining agreement. The Union's response was to propose "ground rules" for further negotiations: the Union would consider the debtors' proposals if the debtors agreed (1) to leave the "successorship clauses" in place, (2) that the modifications would be temporary, with the original agreements to "snap back" in the event that the debtors' financial conditions improved, and (3) to cooperate with the Union in further organizing efforts within the debtor companies. The debtors did not respond to the Union's proposals.

The debtors informed the Union of their decision to liquidate their assets and the reasons therefor at a meeting on March 24, 2004. The parties met again on April 2, 2004; then, in early April, the Union Debt-

ors proposed to terminate their collective bargaining agreements. Those proposals included provisions that, in satisfaction of the Union Debtors' obligations under the collective bargaining agreements, the Union Debtors would pay wages and benefits to a date to be specified and would fund retraining programs and provide letters of recommendation to help employees find new jobs. The Union rejected these proposals without explanation or counteroffer.

During a meeting with the Union on April 21, 2004, the debtors made proposals to modify medical benefits for some 2,200 beneficiaries consisting of hourly-rate employees and their dependents and some 2,000 beneficiaries consisting of retirees covered by the Coal Act and their dependents. Specifically, the debtors proposed to limit medical, vision, and prescription drug benefits to catastrophic medical coverage, to be paid only until a fund for their payment was exhausted; alternatively, the debtors proposed to transfer these benefit obligations to the UMWA 1993 Benefit Plan (the "1993 Plan") for retirees not covered by the Coal Act or the 1992 Plan for retirees covered by the Coal Act.[2] The Union rejected the proposal vis-à-vis "Coal Act" retirees, asserting that obligations under the Coal Act may not be terminated or modified except for benefits under managed care and cost containment rules. The Union also rejected the proposal vis-à-vis "non-Coal Act" retirees, because the 1993 Plan prohibited a reduction in the level of benefits. Accordingly, during a meeting with the Union on June 7, 2004, the debtors submitted a new proposal that

---

**2.** Although the Union has asserted that coverage by the 1992 Plan would not be automatic and could take as long as a year to go into effect, the President of the Union informed members in October 2003 that, "[i]f Horizon is ultimately liquidated, the Coal Act established the UMWA 1992 Benefit Fund to pro-

vide coverage to Coal Act retirees who no longer receive their health benefits from their former employers. If Horizon ceases to exist, the UMWA 1992 Fund will provide health benefits to the Horizon retirees covered by the Coal Act."

did not reduce the benefit to catastrophic coverage only, but provided for the current level of benefits to be provided until the day before confirmation of the Chapter 11 plans at which time the 1993 Plan would begin providing medical coverage to these retirees.

The Union consistently took the position during meetings with the debtors that benefits under the Coal Act may not be modified under § 1114 of the Bankruptcy Code. The Union did not, however, express a view regarding whether it would serve as the Coal Act retirees' authorized representative if its position that § 1114 does not apply was determined to be erroneous. On the other hand, the Union did enter into discussions with the debtors with respect to modifications under managed care and cost containment rules authorized by the Coal Act itself. Thus, the debtors were left with the impression that the Union had assumed full responsibility for representing the interests of the Coal Act retirees in general. Indeed, on October 21, 2003 the President of the Union sent the members a letter assuring them "that the UMWA will take every legal action to ensure that Horizon fulfills its obligations to actives and retirees under the Coal Act and the contract." Accordingly, the court determined at the hearing on the Motions that the Union, having undertaken to represent the interests of the Coal Act retirees, constitutes their "authorized representative" within the meaning of § 1114.

The Debtors now propose to reject the collective bargaining agreements under § 1113 of the Code and to modify medical benefits under § 1114 of the Code. In the latter regard, the debtors propose to terminate medical, vision, and prescription drug expenses for non-Coal Act retirees who were hourly-rate employees and their dependents, effective as of the day before confirmation, with those retirees to receive benefits under the 1993 Plan. The debtors propose to change the current medical benefits afforded to Coal Act retirees from comprehensive medical coverage to catastrophic coverage, payable until the exhaustion of a $500,000 trust fund, with those retirees to receive benefits from the 1992 Plan thereafter.

IV

The debtors called six witnesses to testify at the hearing on the Motions, and the Union called three witnesses. Mike Hymes, Director of Human Resources for the non-Union debtors, testified regarding postpetition changes made to compensation and benefits for non-Union employees. Those changes included revisions of the bonus plan, the addition of a "cap" on severance pay, the imposition of a requirement that maintenance drugs be purchased through a mail order program and that employees pay the difference between the cost of generic drugs and the cost of name brand drugs, and the termination of the pension plan. In addition, more than 1,200 employees were terminated, 52% of which (nearly 700) were non-Union employees.

Steven Cohn of Alvarez and Marsal, a financial consultant to the debtors, estimated that the cost of medical benefits for hourly rate retirees (excluding Coal Act retirees) is approximately $16 million per year. He also testified that he believes that, without the relief sought by the Motions, the Chapter 11 plans would not be confirmable and, therefore, mine reclamation could not be accomplished. The parties stipulated that the employer's monthly contribution under the 1992 Plan is $465 per retiree, but Mr. Cohn was of the opinion that the obligation to make contributions would terminate when the employer goes out of business and also testified that

Coal Act costs may be higher than the 1992 Plan contributions.

Mr. Cohn and James R. Morris, Vice President of Business Development, Land and Engineering for Horizon Natural Resources, LLC, testified that the debtors undertook vigorous efforts to market their operations with the obligations that are the subjects of the Motions but that no offers to purchase the assets with the obligations have been received, Mr. Morris adding that no such offers are anticipated. Mr. Cohn and Mr. Morris also agreed that, absent the relief sought by the Motions, the sales of the debtors' assets would not generate sufficient proceeds to satisfy the postpetition financing and other administrative expenses. Mr. Morris testified that potential buyers had expressed enough interest in Union operations that 30–40 of them signed confidentiality agreements in order to obtain information and documentation as part of their "due diligence" investigations. He added that some of the potential offerors had specifically mentioned the collective bargaining agreements (including the "successorship clause") and employee legacy costs, as well as reclamation costs, although the "Coal Act" legacy costs were not discussed separately.

Mr. Morris also testified that actuarial studies show that liabilities for employee legacy costs are in the range of $400 million to $500 million. He also pointed out that one of the Chapter 11 plans requires the negotiation of reclamation agreements with the governmental agencies charged with responsibility for assuring the reclamation of mining sites, and testified that the governmental units are concerned that the values of the debtors' assets be sufficient to satisfy reclamation obligations. The negotiations with potential buyers to this point have employed values based on the assumption that the assets are free of the Union and employee benefit obligations that are the subjects of the Motions, and it is Mr. Morris's opinion that, if the Motions are denied, the reduced asset values would prevent the successful negotiation of the reclamation agreements.

Michael Buckner, Research Director for the Union, testified that the net assets of the 1993 Plan total approximately $4 million and that, if the net assets fall below $2 million, the trustees are required to reduce benefits payable under the plan. He indicated that the 1993 Plan is already suffering from a negative cash flow and he and Union President Cecil Roberts testified that adding hourly rate retirees as additional beneficiaries of that plan would cause further reductions in benefits to all retirees covered by the plan or perhaps even "collapse" the plan. Both witnesses testified that the 1993 Plan agreement does not expire until December 31, 2006, and the employee contribution to the plan cannot be increased during the agreement's term. Mr. Buckner testified that the employee contribution for new signatories is 150% of the contribution for existing signatories, but did not know which category would encompass the debtors' employees added to the plan. He acknowledged that the Union made no counterproposals in response to the proposals made by the debtors during the liquidation phase of the negotiations.

V

At the outset, the court must determine whether retiree benefits under the Coal Act may be modified or terminated pursuant to § 1114 of the Bankruptcy Code. Section 1114 permits a debtor to modify "retiree benefits" to the extent necessary to permit the debtor's reorganization if certain additional prerequisites, discussed below, are met. 11 U.S.C.

§ 1114(f), (g). On the other hand, the Coal Act provides:

> The last signatory operator of any individual who, as of February 1, 1993, is receiving retiree health benefits from an individual employer plan maintained pursuant to a 1978 or subsequent coal wage agreement shall continue to provide health benefits coverage to such individual and the individual's eligible beneficiaries which is substantially the same as (and subject to all the limitations of) the coverage provided by such plan as of January 1, 1992. Such coverage shall continue to be provided for as long as the last signatory operator (and any related person) remains in business.

26 U.S.C. § 9711(a). In other words, § 1114 expressly permits the modification of retiree benefits while § 9711 expressly prohibits the modification of retiree benefits in effect at the beginning of 1992 for as long as the employer or a related person[3] remains in business.

The 1992 Plan and the Combined Fund (the "Coal Act Plan and Fund") take the position that the term "retiree benefits" includes only benefits received pursuant to contract. The statute defines the term as follows:

> For purposes of this section, the term "retiree benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or

otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a). Thus, the statutory definition makes no distinction between contractual and non-contractual benefits. Moreover, § 1114 clearly contemplates the modification of non-contractual obligations, because it authorizes the appointment of a committee of retirees "to serve as the authorized representative ... of those persons receiving any retiree benefits *not covered by a collective bargaining agreement.*" *Id.* § 1114(d) (emphasis added); *see id.* § 1114(b)(1) ("authorized representative" is person designated under § 1114(d) for "persons receiving retiree benefits not covered by such a[ collective bargaining] agreement").

■ One court has held that "retiree benefits" includes only voluntary—and not statutory—benefits, based on the definition's requirement that the benefits be payable under a "plan, fund, or program ... *maintained or established ... by the debtor* (emphasis added)." *In re Westmoreland Coal Co.,* 213 B.R. 1, 17–19 (Bankr.D.Colo.1997). *Westmoreland* was not decided in the context of determining whether Coal Act benefits may be modified under § 1114(g), but in the context of determining whether Coal Act premiums are entitled to administrative priority under § 1114(e). *But see also LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 154 B.R. 416, 423 (S.D.N.Y.1993) (*policy* behind § 1114(e) supports conclusion that claims under Coal Act are entitled to administrative expense priority), *aff'd,* 53 F.3d 478 (2d Cir.1995). In any event, the

---

**3.** "Last signatory operator" is defined to include successors in interest to the retiree's last employer. 26 U.S.C. § 9711(g)(1); *see Holland v. Williams Mountain Coal Co.,* 256 F.3d 819 (D.C.Cir.2001) (giving "successor in interest" a narrow interpretation). A "related

person" is a company that has common ownership or control with the signatory operator or is a partner or joint venturer with the signatory operator. 26 U.S.C. § 9701(c)(2)(A).

court does not find *Westmoreland* persuasive because, even if the plan, fund, or program was "established" by statute, it is "maintained" by the debtors. *See also Feinstein v. Lewis*, 477 F.Supp. 1256, 1260 (S.D.N.Y.1979) (interpreting a provision of ERISA dealing with plans that are "established or maintained" by a government, holding that a plan that is funded by a government is "maintained" by it), *aff'd*, 622 F.2d 573 (2d Cir.1980). The court concludes that benefits provided pursuant to the Coal Act constitute "retiree benefits" within the meaning of § 1114 of the Bankruptcy Code.

■ The court should use rules of statutory construction, then, to decide the effect of § 1114 of the Code in the circumstances of this case. The Supreme Court has explained that, " 'when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 143–44, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001) (quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)); *see Hildebrand v. Soc. Sec. Admin. (In re Buren)*, 725 F.2d 1080, 1085 (6th Cir.1984) ("The Supreme Court has held repeatedly that a 'cardinal rule' of statutory construction is that repeals by implication are disfavored.") (citations omitted). Neither the Coal Act nor the Bankruptcy Code contains an explicit statement that one is subject to the other. Accordingly, this court must interpret the statutes to give effect to both.

■ The Supreme Court has given us guidance on how to resolve two federal statutes:

"It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted stat-

ute covering a more generalized spectrum," unless the latter statute " 'expressly contradict[s] the original act' " or unless such a construction is " 'absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all.' " "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Traynor v. Turnage*, 485 U.S. 535, 547–48, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *Morton v. Mancari*, 417 U.S. at 551, 94 S.Ct. 2474). Again, the Coal Act, enacted in 1992, does not "expressly contradict" § 1114 of the Bankruptcy Code, enacted in 1988. Section 1114 deals with a narrow, precise, and specific subject: it governs the modification of retiree benefits only when the former employer is a debtor in a Chapter 11 case and only to the extent necessary for the reorganization effort. The Coal Act, on the other hand, a "covers a more generalized spectrum" in that it does not specify whether the former employer is or is not a debtor in possession. The application of § 1114 to retiree benefits covered by the Coal Act does not deprive the latter statute of "any meaning at all": the Coal Act would remain fully applicable where the last signatory operator is not a Chapter 11 debtor in possession or cannot satisfy § 1114's requirements.

■ The intent of each statute is the same: the protection of retiree benefits. The Coal Act seeks to accomplish that goal by requiring former employers to maintain retiree benefits as long as they are in business. The Bankruptcy Code seeks to accomplish that goal by providing that

"[b]enefits may be modified only if retirees agree or if the court issues an order after evaluating a proposed modification under strict standards." 134 CONG. REC. H3,486 (daily ed. May 23, 1988) (statement of Rep. Edwards); *see* 11 U.S.C. § 1129(a)(13) (plan must provide for continuation of retiree benefits as modified pursuant to § 1114(e)(1)(B) or (g)). In enacting § 1114, Congress sought to minimize the impact of Chapter 11 on retirees while, at the same time, recognizing that modifications of retiree benefits may be necessary to the debtor's reorganization. Congress balanced these competing interests by permitting retiree benefit modifications only if good faith attempts to reach a compromise fail, the modifications are necessary to the reorganization, all parties are treated fairly and equitably, and the balance of the equities clearly favors permitting the modifications. While the Coal Act imposes a general prohibition against certain retiree benefit modifications, the Bankruptcy Code agrees with that general prohibition but establishes an extremely limited exception.

The court does not find persuasive the debtors' attempt to reconcile the statutes. They rely on § 9711(d) of the Coal Act, which provides:

The last signatory operator shall not be treated as failing to meet the requirements of subsection (a) or (b) if benefits are provided to eligible beneficiaries under managed care and cost containment rules and procedures described in section 9712(c) or agreed to by the last

signatory operator and the United Mine Workers of America.

The debtors would read this provision as indicating that Subsection (a) does not apply if either (1) benefits are provided under managed care and cost containment rules and procedures described in Section 9712(c), or (2) it is agreed between the former employer and the Union that Subsection (a) does not apply. While there appear to be no reported decisions interpreting this provision, the court believes that it makes Subsection (a) inapplicable only if benefits are provided under managed care and cost containment rules and procedures, either (1) promulgated or adopted pursuant to Section 9712(c) or (2) established by agreement. In other words, the exception to Section 9711(a) relates only to managed care and cost containment rules and procedures. A review of § 9712(c)(2) and (3) leads to the conclusion that a change in the level of benefits does not fall within the scope of "managed care and cost containment rules and procedures." [4]

While there are no available decisions discussing the interplay between § 9711(a) of the Coal Act and § 1114 of the Bankruptcy Code,[5] there is at least one decision addressing the interrelationship between the Coal Act and another provision of the Code. In *In re Lady H Coal Co.*, 199 B.R. 595, 597, 599 (S.D.W.Va.1996), the debtors filed a motion for authority to sell assets free and clear of liens and encumbrances, and the 1992 Plan objected to the sale being free and clear of obligations under

**4.** The debtors also point out that Article V.A. of the Coal Act plan permits the unilateral modification or termination by the employer following termination of the National Bituminous Coal Wage Agreement of 1993, and that that agreement has been terminated. A provision of the plan cannot, however, prevail over the language of the statute.

**5.** In an analogous decision, one bankruptcy court held that a tax levy may be set aside as a preference under § 547 of the Bankruptcy Code despite § 6331(e) of the Internal Revenue Code, which provides that a tax levy continues until it is released. *Ballard v. State (In re Ballard)*, 131 B.R. 97 (Bankr.W.D.Wis. 1991).

the Coal Act.[6] The bankruptcy judge first questioned whether the objections served the interests of the objector's constituents since the sales were necessary to generate funds to pay their claims. *Id.* at 599. The judge concluded that Coal Act obligations constitute "claims" within the meaning of the Bankruptcy Code so that, under Code § 363(f), the assets may be sold free and clear of those obligations:

> If Congress wished to exclude Coal Act liabilities from the reach of bankruptcy law, it could have done so by providing exceptions to a sale free and clear of any interest or limiting the definition of claim in the Bankruptcy Code or by providing express language in the Coal Act that liabilities remain unaffected by operation of the Bankruptcy Code. However, Congress has not provided any express statutory language which would limit the definition of a claim under the Bankruptcy Code to preclude the past and future liabilities of these Debtors as created by the Coal Act.

*Id.* at 603.[7] In so holding, the judge construed "successor in interest," as that term is used in the Coal Act, to exclude buyers pursuant to arm's length transactions including § 363 sales. *Id.* at 608. The bankruptcy judge's advice to the 1992 Plan was as follows:

> Therefore, it is now time for the UMWA and the 1992 Plan to do what every creditor has a right to do at such a sale; encourage bidders who they would like to have operate these properties, consider investing in or becoming an owner of the enterprise, or enter into an agreement with a buyer to assure that some of the profitability problems of the past are solved upon purchase of the Debtors' assets.

*Id.* at 607. The district court, which had referred the matter to the bankruptcy judge, adopted its proposed findings of fact and conclusions of law, *id.* at 598,[8] and the Fourth Circuit affirmed, *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996).

The Fourth Circuit held that, "even if [a buyer at a § 363 sale constitutes] a successor in interest, the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)." *Id.* at 585. In so doing, the court rejected some of the same arguments made in these cases:

> Third, the Plan and Fund have contended that, by allowing the Bankruptcy Court to order the sale of the debtors' assets free and clear of the debtors' Coal Act obligations, the District Court in *Lady H* has granted purchasers in bankruptcy settings a windfall: while such purchasers might have been liable for debtors' Coal Act obligations if the sales

---

**6.** The Union also objected to the sale free and clear of the National Bituminous Coal Wage Agreement of 1993 on account of its successorship clause. *Lady H Coal Co.*, 199 B.R. at 599, 601, 604, 606. That objection met with the same fate as the 1992 Plan's objection. *Id.* at 604–07.

**7.** While the debtors' right to sell their assets free and clear of retiree benefit obligations is not presently before the court, their plans do state that they are intended to constitute motions for authority to sell the assets free and clear under § 363.

**8.** Likewise, in *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.*, 201 B.R. 163, 165, 168 (S.D.W.Va.1996), *aff'd,* 99 F.3d 573 (4th Cir.1996), the Coal Act Plan and Fund objected to a sale of assets free and clear of Coal Act obligations. *As in Lady H Coal,* the district court construed "successor in interest" to exclude purchasers at § 363 sales, *id.* at 170–71, thereby avoiding any conflict between the statutes.

had not occurred in bankruptcy settings, they are permitted to escape those obligations if they insist that the debtors obtain free and clear orders. We reject that argument, finding that it is our duty to enforce the statutory scheme that Congress has erected.

Finally, the Plan and Fund have argued that, by allowing bankruptcy courts to declare that the purchasers of coal operators' assets take those assets free and clear of the operators' Coal Act obligations, the District Court in *Lady H* has set the stage for the same kind of funding crisis that prompted the enactment of the Coal Act. Though we are cognizant of the Plan's and Fund's concerns, we find their argument insufficiently persuasive to disturb the statutory scheme as we have found it. First, the Plan's and Fund's concerns are probably most appropriately addressed to Congress. Second, it might very well be that, at least in circumstances such as those presented in the cases at bar, a rule permitting the issuance of free and clear orders protects the Fund's and Plan's interests more effectively than a contrary rule. In *Leckie Smokeless,* for example, the Bankruptcy Court found that $1.9 million represented a fair and reasonable price for the debtors' assets; the debtors' accrued Coal Act obligations, though, stand at about $7 million. If a free and clear order could not be issued, the assets would almost inevitably have to be sold piecemeal, thereby generating fewer funds with which to satisfy the claims of the Fund, the Plan, and the debtors' other creditors. *Id.* at 586–87.

The reasoning of *Lady H* is equally applicable to these cases. "If Congress wished to exclude Coal Act [benefits] from the reach of [§ 1114] of the bankruptcy law, it could have done so by providing exceptions to [the court's authority to modify such obligations] or by limiting the definition of [retiree benefits] in the Bankruptcy Code or by providing express language in the Coal Act that [obligations] remain unaffected by operation of the Bankruptcy Code." *Lady H Coal Co.,* 199 B.R. at 603. The difference in treatment between debtors in possession and other signatory operators is justified by the former's interests in reorganizing and, in any event, "it is our duty to enforce the statutory scheme that Congress has erected." *Leckie Smokeless Coal Co.,* 99 F.3d at 586. Finally, any additional financial problems encountered by the 1992 Fund resulting from the application of § 1114 to Coal Act obligations should be addressed by Congress and do not justify "disturb[ing] the statutory scheme as we have found it." *Id.* It is in the best interests of the Coal Act Plan and Fund and their beneficiaries and creditors generally that the debtors' assets be sold for the best possible price, not on a piecemeal basis. If the modification of the Coal Act retiree benefits is necessary to accomplish that goal and the other requirements of § 1114 are satisfied, modification must be permitted.

## VI

Turning to the application of §§ 1113 and 1114 to the facts of these cases, the conditions under which a collective bargaining agreement may be rejected are as follows:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
>
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
>
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c). The "requirements of subsection (b)(1)" are as follows:

Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

*Id.* § 1113(b)(1). As this court has recognized:

In regard to the requirements of that section [1113], courts have historically applied the nine-part test enunciated in *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.1984):

1) The debtor in possession must have made a proposal to the union;

2) The proposal must be based on the most complete and reliable information available at the time of the proposal;

3) The modification must be necessary to permit reorganization;

4) The modification must provide that all affected parties are treated fairly and equitably;

5) The debtor must provide the union with such relevant information as is necessary to evaluate the proposal;

6) The debtor must have met with the collective bargaining representative at reasonable times subsequent to making the proposal;

7) The debtor must have negotiated with the union concerning the proposal in good faith;

8) The union must have refused to accept the proposal without good cause; and

9) The balance of the equities must clearly favor rejection of the agreement.

*In re Sun Glo Coal Co.*, 144 B.R. 58, 62 (Bankr.E.D.Ky.1992).

■■■ Similarly, the conditions under which retiree benefits may be modified are as follows:

The court shall enter an order providing for modification in payment of retiree benefits if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities;

except that in no case shall the court enter an order providing for such modification which provides for a modification to a level lower than that proposed by the trustee in the proposal found by

the court to have complied with the requirements of this subsection and subsection (f). . . .

11 U.S.C. § 1114(g). The "requirements of subsection (f)" are as follows:

(f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall—

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.

*Id.* § 1114(f). The requirements for modification of retiree benefits are, therefore, substantially the same as the requirements for rejection of collective bargaining agreements, so *American Provision's* nine-part analysis is equally appropriate.

■■■ There is no dispute that the debtors have made proposals to the Union regarding modifications to the collective bargaining agreements and the retiree benefits, that the proposals were based on the most complete and reliable information

available, that the debtors have provided the Union with all relevant information, or that the debtors have met with the Union on numerous occasions. With respect to whether the debtors negotiated in good faith and whether the Union rejected the proposals without good cause, the court has its doubts insofar as the 2003 negotiations are concerned. The debtors initially proposed modifications so sweeping that the Union may be correct in characterizing them as "overreaching." Nor can the court say that the Union's response—proposing a set of "ground rules" for further negotiations—was inappropriate. While the requirement of cooperation in further organizing efforts may have gone too far, perhaps the debtors should have considered the "snap back" proposal and the proposal to retain the successorship clause or some variation of those proposals. However, those negotiations are essentially irrelevant considering that the debtors ultimately determined that they must liquidate their assets, and then made new proposals in April 2004.

■■■ The propriety of the debtors' 2004 proposals and the Union's responses thereto depends largely on whether those proposals were "necessary to permit the reorganization of the debtors": if they were, the proposals would have been made in good faith and the rejection of (or failure to respond to) the proposals would have been without good cause. Sections 1113 and 1114 apply in liquidation Chapter 11 cases. *United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc. (In re Family Snacks, Inc.),* 257 B.R. 884, 893–95 (8th Cir. BAP 2001) (§ 1113); *United Steelworkers of Am., AFL–CIO, CLC v. Ohio Corrugating Co.,* No. 4:90CV0810, 1991 WL 213850, at *4 (N.D.Ohio Jan. 3, 1991) (§ 1113); *In re Lady H Coal Co.,* 193 B.R. 233, 240 (Bankr.S.D.W.Va.1996) (§ 1113); *In re*

*Ionosphere Clubs, Inc.,* 134 B.R. 515, 524 (Bankr.S.D.N.Y.1991) (§ 1114); *In re Garfinckels, Inc.,* 124 B.R. 3, 3–4 (Bankr. D.D.C.1991) (§ 1114); Alan N. Resnick, Henry J. Sommer & Lawrence P. King, *Collier on Bankruptcy* ¶ 1113.02[1] (15th ed. rev.2004). In the Chapter 11 liquidation context, "necessary to permit reorganization" means "necessary to confirmation of the plan":

> Under the circumstances of this case, the only meaningful interpretation of "necessary to permit the reorganization" that is consistent with fair and equitable treatment of retirees and all other creditors is one that does not encourage the Trustee or the Creditors' Committee to seek to convert the case from Chapter 11 to Chapter 7 solely to preserve the possibility of some recovery for general unsecured creditors. In other words, in this liquidating case, "necessary to permit the reorganization" must be interpreted to mean "necessary to accommodate confirmation of a Chapter 11 plan."

*Family Snacks,* 257 B.R. at 896 (citing *In re Ionosphere Clubs, Inc.,* 134 B.R. 515, 524–25 (Bankr.S.D.N.Y.1991)).[9]

The unrefuted evidence before the court is that the debtors' assets cannot be sold subject to the collective bargaining agreements and retiree benefits, or cannot be sold subject to those obligations for a price sufficient pay administrative expenses or otherwise consummate the proposed Chapter 11 plans. The debtors have engaged in active efforts to sell the assets subject to the obligations, but no such offers have been received and none are anticipated. The amounts of the employee legacy costs, including the costs of medical benefits for hourly rate retirees and for Coal Act beneficiaries, support the conclusion that potential buyers might well have no interest in assuming such obligations. In short, the court finds credible the testimony that the plans cannot be confirmed or consummated absent the relief sought by the Union Debtors and the other movants seeking relief under § 1114, particularly in that no contrary evidence was introduced. The debtors have carried their burden of showing that, absent the rejection of the collective bargaining agreements and the proposed modifications of the retiree benefits, conversion of these cases to Chapter 7 and a piecemeal liquidation would ensue. The court concludes, therefore, that the relief sought is necessary to permit the debtors' reorganization. It follows that the debtors' 2004 proposals were made in good faith and the Union's failure to accept the proposals was without good cause.[10]

The court further concludes that the proposed modifications treat all affected parties fairly and equitably, and that the balance of the equities clearly favors the relief sought. First, the proposals do not discriminate against Union employees or retirees. Rather, the debtors have made comparable reductions in their non-Union work force and in the compensation and benefits provided to non-Union employees, in an effort to make their operations more

---

9. *Family Snacks* was a § 1113 case, but it borrowed its interpretation of "necessary to permit reorganization" in the context of a liquidating plan from the *Ionosphere Clubs* case, which involved the application of § 1114, so the construction is equally applicable to the analysis under each provision.

10. The Union's lack of good cause is further demonstrated by the fact that it failed to articulate any reason for rejecting the debtors' proposals. *E.g., Truck Drivers Local 807, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp., Inc.,* 816 F.2d 82, 92 (2d Cir.1987); *In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363, 371 (Bankr.N.D.Ill.1990) (citing *N.Y. Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.),* 848 F.2d 345 (2d Cir.1988)).

profitable and attractive to would-be purchasers. Second, the rejection of the collective bargaining agreements could well have the effect of *preserving* jobs, albeit non-Union jobs. The testimony is that the assets of the Union Debtors cannot be sold as Union operations. Thus, absent the rejection, those mines would be closed and the Union Debtors' assets sold on a piecemeal basis. In that event, the Union Debtors' employees would be idled until the buyer restarted operations, if operations are restarted at all. On the other hand, if the Union Debtors' operations are sold as going concerns, there is no reason to believe that the miners' employment would suffer any interruption.

Third, retirees are not left without any benefits whatsoever: the hourly-rate retirees may be eligible for benefits under the 1993 Plan; and the Coal Act retirees will continue to receive limited (catastrophic) medical coverage for a period of time and may then be eligible for benefits under the 1992 Plan. Fourth, the modifications are also necessary to achieve fairness to creditors including secured and administrative creditors, who would receive considerably less as a result of a piecemeal Chapter 7 liquidation. Fifth, the modifications also serve the interests of the general public, represented by governmental agencies charged with enforcing mine reclamation laws and regulations, because the evidence before the court demonstrates that reclamation is unlikely unless purchasers of assets assume responsibility therefor or the reclamation agent is able to sell "orphan" assets.

## VII

The court is aware of the hardships worked on the employees of these companies, both Union and non-Union, because of the failure of the business of the debtors. That hardship is also worked on many creditors, not all of which are multinational companies with thousands of customers but are small businesses to which the debtors were important or critical customers. Unfortunately for everyone involved with these companies, the debtors encountered financial difficulties that ultimately require them to sell their assets to help pay debts, reclaim the mine sites, and try to assure continued employment for their miners and other personnel.

In Chapter 11 cases, this court is charged with the responsibility of applying the Bankruptcy Code and other relevant laws having as their goal the successful accomplishment of reorganization plans. The court has found that the debtors' Chapter 11 plans cannot be confirmed and consummated without the relief requested in the Motions.

For the foregoing reasons, the court will enter separate orders sustaining the Motions.