[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13832

_____

In Re: UNITED STATES PIPE & FOUNDRY CO.,

Debtor.

_____

UNITED STATES PIPE AND FOUNDRY COMPANY, LLC,
JW ALUMINUM COMPANY,
JW WINDOW COMPONENTS LLC,

Plaintiffs-Appellants,

versus

MICHAEL H. HOLLAND,
as Trustee of the United Mine Workers of America
1992 Benefit Plan,
MICHAEL MCKOWN,

as Trustee of the United Mine Workers of America
1992 Benefit Plan,
JOSEPH R. RESCHINI,
as Trustee of the United Mine Workers of America
1992 Benefit Plan,
CARLO TARLEY,
as Trustee of the United Mine Workers of America
1992 Benefit Plan,
MICHAEL H. HOLLAND,
as Trustee of the United Mine Workers of America
Combined Benefit Fund, et al.,

                                    Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-00891-CEH

———————————

Before WILLIAM PRYOR, Chief Judge, GRANT, and ANDERSON, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

        This appeal requires us to decide whether a bankruptcy plan of reorganization confirmed in 1995 discharged the obligation of

three debtor companies to provide future health-care benefits to retired employees of a coal company that was once part of the same corporate family. In 2016, after the coal company's future obligations to the retirees were discharged, the trustees of two health-care benefit funds sued to compel the related companies to pay for the benefits. The bankruptcy court and district court ruled that the 1995 plan of reorganization did not discharge the claims for future benefits. We disagree. The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is . . . unliquidated," "contingent," "unmatured," or "equitable," and as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5). And with exceptions not relevant here, a plan of reorganization discharges a debtor from all claims "that arose before" the "order confirming the plan" unless the plan itself excludes those claims. *Id.* § 1141(d)(1), (1)(A). Because the companies' obligations to provide health-care benefits were fixed before the bankruptcy court confirmed the plan of reorganization, the Trustees' claims for future retiree benefits were discharged in 1995. So, we reverse and remand for further proceedings.

## I. BACKGROUND

Several decades ago, the coal industry signed a series of wage agreements ensuring that retired employees and their immediate families would receive health benefits for the rest of their lives. *United Mine Works of Am. Combined Benefit Fund v. Toffel* (*In re Walter Energy, Inc.*), 911 F.3d 1121, 1127–28 (11th Cir. 2018).

Industry conditions then changed and threatened the coal industry's continued viability. Coal companies that failed or chose not to renew their wage agreements stopped contributing to the funds even though their workers continued to receive benefits as "orphaned retirees." *Id.* at 1128. As a result, the retiree funds "were on the brink of insolvency," and worker strikes followed. *Id.* at 1129. In response to the threatened vitality of the funds, Congress converted the "contractual obligation to provide health care benefits . . . into a statutory requirement" by enacting the Coal Industry Retiree Health Benefit Act of 1992. Pub. L. No. 102-486, 106 Stat. 3036; *See In re Walter Energy*, 911 F.3d at 1130.

The Coal Act sought to ensure the longevity of the retiree funds through two primary means. First, it required companies to continue to provide benefits. *See* 26 U.S.C. §§ 9704(a), 9711(a), 9712(d)(1), (3). Second, it made all "related person[s]"—which is defined broadly to include a company under common control of a specified coal company and a company that is "member of [a] controlled group of corporations" that includes a specified coal company—jointly and severally liable for all required payments under the Coal Act. *See id.* §§ 9701(c)(2)(A), 9704(a), 9711(c)(1), 9712(d)(4). These provisions addressed the problems caused by coal companies that stopped paying for benefits when they chose not to renew their wage agreements or went out of business.

Whether an entity is a related person under the Coal Act was fixed on July 20, 1992. That is, entities that were related persons in 1992 but are no longer related persons are still related persons, and

entities that are now related to a coal company, but were not in 1992, are not. *Id.* § 9701(c)(2)(B). On July 20, 1992, the companies in this appeal were owned by a common parent company, now known as Walter Energy, Inc., that also owned a coal company, Jim Walter Resources, Inc., so the companies are "related persons" under the Coal Act. *See id.* § 9701(c)(2)(A)(i)–(ii), (c)(2)(B).

The Coal Act imposes three kinds of obligations on covered entities. First, covered entities must pay premiums to the Combined Benefit Fund, *id.* § 9704(a), which was formed from the funds established by earlier wage agreements, *id.* § 9702(a)(2); *In re Walter Energy*, 911 F.3d at 1127 & n.3. The Combined Fund provides benefits to workers who were "eligible to receive, and [were] receiving, benefits from" industry funds on July 20, 1992. 26 U.S.C. § 9703(a), (f). The covered entities pay an annual premium that is calculated by the Commissioner of Social Security and is based on the number of beneficiaries assigned to the coal company and the Combined Fund's estimated costs. *Id.* § 9704(a), (b)–(d). When a covered coal company and all related persons are no longer in business, the premium amount becomes zero. *See id.* § 9704(b)(2), (c)–(d), (f)(1), (f)(2)(B). An entity remains in business so long as it "conducts . . . any business activity" or "derives revenue from any business activity, whether or not in the coal industry." *Id.* § 9701(c)(7). Second, the Coal Act requires signatories of the 1978 wage agreement and later agreements to continue providing health-care benefits to workers, as the signatories were doing through individual employer plans under the wage agreements. *Id.* § 9711(a)–(b).

Benefits are provided directly to the retired coal miners, and the obligation lasts "for as long as the [specified coal company] (and any related person) remains in business." *Id.* § 9711(a). Finally, some covered entities must pay premiums to the 1992 United Mineworkers of America Benefit Plan. *Id.* § 9712(d)(1).

The 1992 Plan is a benefit fund which was established by the Coal Act. *Id.* § 9712(a)(1). As relevant here, the 1992 Plan provides benefits to miners who are owed, but are not receiving, benefits under section 9711. *Id.* § 9712(b)(2)(B). Covered entities that fail to provide health-care benefits to their assigned retirees under section 9711 are required to pay monthly premiums to the 1992 Plan. *Id.* § 9712(d).

In 1989, the Jim Walter companies, their parent company, and its other subsidiaries filed petitions for bankruptcy, which were administratively consolidated. In 1995, the bankruptcy court confirmed a consensual plan of reorganization. The Trustees did not file a proof of claim for future Coal Act obligations and did not object to the plan. The Trustees did file a proof of claim in the individual bankruptcy proceeding of Jim Walter Resources. That proof of claim included past-due payments owed under the wage agreements and argued that Coal Act premiums that came due during the pendency of the bankruptcy proceedings were entitled to administrative priority.

The plan of reorganization discharged all "[c]laims" against the companies that "arose at any time before the [e]ffective [d]ate" unless those claims were included in the plan. Walter Energy

expressly assumed the obligations to fund retiree health benefits, and the order approving the plan "authorized and directed" Walter Energy "to fund retiree health benefits." Several years after the bankruptcy court confirmed the plan, the companies disassociated themselves from Walter Energy and the coal industry.

In 2015, Walter Energy again filed a petition for bankruptcy. *See Voluntary Petition, In re Walter Energy, Inc.*, No. 15-02741-TOM11 (Bankr. N.D. Ala. Jul. 15, 2015) (ECF No. 1). "The bankruptcy court entered an order . . . terminating [Walter Energy's] obligations to provide retirees [benefits under section 9711] as well as to pay premiums to the Funds." *In re Walter Energy*, 911 F.3d at 1134. Walter Energy stopped providing benefits and paying premiums under the Coal Act in April 2016.

In July 2016, the Trustees gave notice to the related companies that the Trustees considered them to be liable for Coal Act obligations. Specifically, the Trustees considered the companies to be liable to pay premiums to the Common Fund and 1992 Plan for the period when Walter Energy was not providing benefits directly to its retirees and to provide benefits directly to retirees through an individual employer plan. The companies refused to pay the premiums or provide the benefits.

The Trustees then sued the companies in the district court for the District of Columbia and sought a declaratory judgment that the companies were liable under the Coal Act, a money judgment for the full amount of past-due premiums, and equitable relief in the form of an injunction ordering the companies to pay

8                          Opinion of the Court                     20-13832

premiums and establish and maintain an individual employer plan. *See Amended Complaint, Holland v. U.S. Pipe & Foundry Co.*, No. 1:16-cv-1577 (D.D.C. Mar. 27, 2017) (ECF No. 22). The companies responded by filing complaints in their original consolidated bankruptcy proceeding. The companies asserted that the Trustees' Coal Act claims against the companies were discharged in 1995 and that the Trustees were barred by the plan of reorganization from attempting to enforce those claims. The Trustees moved to dismiss the complaints, and one of the companies, United States Pipe and Foundry Company, LLC, moved for partial summary judgment.

The bankruptcy court treated the Trustees' motion as a motion for summary judgment and granted it, and the bankruptcy court denied U.S. Pipe's motion. It reasoned that the premiums must be either a "contingent claim or a tax." If the premiums were a contingent claim in 1995, it would have been discharged in the 1995 bankruptcy because under the Bankruptcy Code a "claim" includes any "right to payment" even if the right is "contingent." *See* 11 U.S.C. § 101(5)(A). Alternatively, the bankruptcy court reasoned that if the premiums were a tax, then claims for those premiums would have arisen only when the premiums were assessed, and so they would not have been discharged.

To determine whether Coal Act premiums were taxes, the bankruptcy court applied the test from *County Sanitation District No. 2 of Los Angeles County v. Lorber Industries of California, Inc.* (*In re Lorber*), 675 F.2d 1062 (9th Cir. 1982). It explained that "[u]nder the *Lorber* test, [payments] are a tax if they are (1)

20-13832               Opinion of the Court                    9

regardless of their name, an involuntary pecuniary burden laid on individuals or property (2) imposed by or under authority of the legislature (3) for a public purpose (including defraying governmental expenses) (4) under the state's police or taxing power." The bankruptcy court concluded that the premiums owed under the Coal Act were "unquestionably a tax." It did not address the Trustees' alleged right to compel the companies to provide health-care benefits directly to retirees under section 9711.

The district court affirmed. It agreed with the Trustees and the bankruptcy court that because Coal Act premiums are taxes, claims for those premiums arose only when the premiums were assessed. The district court also addressed the Trustees' claim under section 9711 and concluded that only debts can be discharged in bankruptcy, and not "obligations giving rise to [] debts" like the requirement to provide benefits. (Emphasis omitted.)

## II. STANDARD OF REVIEW

"We review *de novo* conclusions of law whether by the bankruptcy court or the district court." *In re Walter Energy*, 911 F.3d at 1135.

## III. DISCUSSION

The parties dispute whether the companies' Coal Act obligations were discharged by the 1995 order confirming the companies' plan of reorganization. The parties agree that the Trustees' asserted rights to the payment of Combined Fund and 1992 Plan premiums are "claims" under the Bankruptcy Code. But the

Trustees assert that those "claims" arose only when the premiums were assessed to the companies. So, they argue, those claims did not exist in 1995 and could not have been discharged by the consensual plan. The Trustees also argue that their alleged right to compel the companies to provide benefits to retirees under section 9711 of the Coal Act is not a claim because it is a right to an equitable remedy that does not fall within the Bankruptcy Code's definition of "claim." The Trustees conclude that because the companies' Coal Act obligations were not discharged, the Trustees can enforce those obligations. We disagree.

Under the Bankruptcy Code, the term "claim" is defined broadly to include two overlapping kinds of rights. Section 101(5)(A) defines a "claim" to include all "right[s] to payment, whether or not such right[s] [are] . . . liquidated, unliquidated, fixed, contingent, matured, unmatured, . . . legal, [or] equitable." 11 U.S.C. § 101(5)(A). Section 101(5)(B) addresses equitable remedies and includes all "right[s] to an equitable remedy for breach of performance if such breach gives rise to a right to payment." *Id.* § 101(5)(B). Based on this statutory text, the Supreme Court has explained that "Congress intended" to enact "the broadest available definition of 'claim,'" *see Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991), to give debtors a "fresh start," *Owaski v. Jet Fla. Sys., Inc.* (*In re Jet Fla. Sys., Inc.*), 883 F.2d 970, 972 (11th Cir. 1989) (internal quotation marks omitted). *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 2, at 56 (2012) ("[P]urpose must be derived from the text . . . ."). "It is

as if the bankruptcy process creates two separate firms—the pre-bankruptcy firm that pays off old claims against pre-bankruptcy assets, and the post-bankruptcy firm that acts as a brand new venture." *Bos. & Me. Corp. v. Chi. Pac. Corp.*, 785 F.2d 562, 565 (7th Cir. 1986).

We divide our discussion in two parts. First, we explain why the Trustees' claims for premiums to the Combined Fund were discharged in 1995. Second, we explain why the Trustees' claims under section 9711 and for premiums to the 1992 Plan were discharged in 1995.

## A. The Trustees' Claims for Combined Fund Premiums Existed and Were Discharged in 1995.

A claim exists and is dischargeable whenever a debtor's liability on that claim arises from its past conduct and "there is a relationship established . . . between an identifiable claimant" and that past conduct. *See Epstein v. Off. Comm. of Unsecured Creditors of Est. of Piper Aircraft Corp.* (*In re Piper Aircraft, Corp.*), 58 F.3d 1573, 1577 (11th Cir. 1995); 11 U.S.C. § 101(12). Requiring a preexisting relationship ensures that creditors have adequate notice that their rights are at stake to satisfy due process. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (explaining that adequate "notice" is "[a]n elementary and fundamental requirement of due process"); *see also Jeld-Wen, Inc. v. Van Brunt* (*In re Grossman's Inc.*), 607 F.3d 114, 123–26 (3d Cir. 2010); *Saint Catherine Hosp. of Ind., LLC v. Ind. Fam. & Soc. Servs. Admin.*, 800 F.3d 312, 315–16 (7th Cir. 2015). So, any liability on a claim based on the

debtor's conduct that occurred before the effective date of its plan of reorganization is dischargeable so long as there is a relationship between the debtor and creditor before that date. *See First Nat'l Bank of Oneida, N.A. v. Brandt*, 887 F.3d 1255, 1260 (11th Cir. 2018); 11 U.S.C. § 1141(d)(1), (1)(A); Douglas G. Baird & Thomas H. Jackson, Kovacs *and Toxic Wastes in Bankruptcy*, 36 STAN. L. REV. 1199, 1200 (1984) (explaining that when an "obligation . . . arises out of [the debtor's] past conduct," the obligation is dischargeable).

The Trustees held "claims" for future Combined Fund premiums in 1995 because their right to payment was based on the companies' pre-confirmation conduct. In 1995, the companies' liability to the retirees had already been fixed; only the amount owed was uncertain. On July 20, 1992, the companies became "related person[s]" because they were related to a signatory of the relevant coal industry wage agreements. *See* 26 U.S.C. §§ 9701(c)(2), 9704(a), 9706(a). This status as related persons made the companies jointly and severally liable for Combined Fund premiums. *See id.* § 9704(a). And the companies could do nothing outside of bankruptcy to avoid or diminish this liability. *See United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573, 581 n.9 (4th Cir. 1996) (explaining that Coal Act liability is "fixed" because a covered entity "remains liable" for Coal Act obligations "even if it chooses to cease coal mining operations and to take up an entirely different

enterprise"). So, the Trustees held a "claim" in 1995 because they had a "fixed" "right to payment." *See* 11 U.S.C. § 101(5)(A).

To be sure, the amount of the Trustees' right was uncertain, and the Trustees could not maintain a suit against the companies, but neither fact is relevant to our inquiry. Those facts render the Trustees' right merely "unliquidated," *see* 11 U.S.C. § 101(5)(A), because the amount owed was not "fixed, . . . agreed upon, or . . . capable of ascertainment," *Liquidated Claim*, BLACK'S LAW DICTIONARY (5th ed. 1979); *see also Liquidated Debt, id.* ("A debt is liquidated when it is certain what is due and how much is due."), and "unmatured," *see* 11 U.S.C. § 101(5)(A), because it was not "unconditionally due and owing," *see Matured Claim*, BLACK'S LAW DICTIONARY, *supra*. And a "claim"—as the term is defined by the Bankruptcy Code—includes rights that are both "unliquidated" and "unmatured." *See* 11 U.S.C. § 101(5)(A). So, neither the uncertain amount of the Trustees' right to payment nor its enforceability alter the conclusion that the Trustees' claim existed in 1995.

The Trustees also had a sufficient pre-confirmation "relationship" with the companies to be "aware of" their own rights. *See United States v. LTV Corp.* (*In re Chateaugay I*), 944 F.2d 997, 1005 (2d Cir. 1991). The Coal Act was enacted nearly three years before the effective date of the plan of reorganization, *see* Coal Industry Retiree Health Benefit Act of 1992 (enacted October 24, 1992), and the companies' joint and several liability to pay premiums began nearly two-and-a-half years before that date, *see* 26 U.S.C. § 9704(a), (b)(2) (providing that Combined Fund premiums

begin to come due on February 1, 1993). Indeed, the Trustees knew about the companies' liability because the Trustees filed a proof of claim in Jim Walter Resources' original bankruptcy proceedings.

Some confusion might arise from comparing the Coal Act to generally applicable laws. Some laws—such as environmental laws—impose penalties on all entities that violate them. Other laws—such as state unemployment tax laws or antidiscrimination laws—impose obligations on any entity that engages in specified conduct. These laws continue to impose obligations on a debtor after bankruptcy proceedings because the basis of an entity's liability is not pre-confirmation conduct; the obligations arise regardless of bankruptcy status. Cf. Ohio v. Kovacs, 469 U.S. 274, 285 (1985) (explaining that reorganized entities must comply with general laws); Mich. Emp. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1149 (6th Cir. 1991) (concluding that post-discharge "unemployment tax liability" is not dischargeable because it "arises only by virtue of . . . post-petition employment of workers"); O'Loghlin v. County of Orange, 229 F.3d 871, 874–75 (9th Cir. 2000) (holding that, where an employer was a covered entity under the Americans with Disabilities Act after bankruptcy, a "claim that the [employer] violated the [Disabilities Act] after" confirmation was not discharged by the confirmation order).

By contrast, an entity's liability under the Coal Act to pay premiums to the Combined Fund turns solely on the companies' pre-confirmation conduct. See 26 U.S.C. §§ 9701(c)(2), 9704(a). The

Coal Act imposed liability on the companies on July 20, 1992, because they were related persons to an entity that had signed certain coal-industry wage agreements. And a plurality of the Supreme Court concluded that the Coal Act is unconstitutional in its application to an entity that did not execute the relevant wage agreements. *See E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion). So, we cannot say that the companies' liability is based on their post-confirmation conduct.

The Trustees argue that they had no right to payment in 1995 because the companies' "liability [was] triggered" only by their post-confirmation conduct. They maintain that, because the premium amount becomes zero if the companies and all other related persons stop conducting or deriving revenue from any business activity, liability is contingent on the companies' post-confirmation conduct. But the Trustees are mistaken.

The Trustees erroneously assume that in 1995 the companies' liability was "conditioned upon the occurrence of some future event which is itself uncertain, or questionable." *See Contingent*, BLACK'S LAW DICTIONARY, *supra*. As we have explained, the companies' *liability* to pay premiums to the Combined Fund became fixed before 1995 even though the *amount* due each year was contingent and even though that amount might be zero. *See* 11 U.S.C. § 101(5)(A) (defining a "claim" as any "right to payment, whether or not such *right* is . . . fixed . . . [or] contingent" (emphasis added)); *In re Leckie*, 99 F.3d at 581 n.9. Covered entities remain liable under the Coal Act even when the premium assessed in a given year

is zero. So, the Trustees' claims existed and were discharged in 1995.

The Trustees suggest that the companies' joint and several liability with Walter Energy should affect our analysis, but we disagree. We have explained that "confirmation of a debtor's . . . plan [of reorganization] does not discharge the obligations of a third-party guarantor" because the *debtor* is discharged from the debt. *See Shure v. Vermont* (*In re Sure-Snap Corp.*), 983 F.2d 1015, 1019 (11th Cir. 1993) (citing 11 U.S.C. § 524(e)). So, the Trustees' claims against the companies can be discharged even if the Trustees' claims against Walter Energy were not. And although the Trustees did not seek payment from the companies until 2016, "the fact that" the Trustees could not maintain a suit against the companies until Walter Energy stopped paying premiums "does not alter the conclusion" that the Trustees held a claim in 1995 that was discharged in bankruptcy. *See Stewart Foods, Inc. v. Broecker* (*In re Stewart Foods, Inc.*), 64 F.3d 141, 146 (4th Cir. 1995); *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1412 (2017).

In support of their argument, the Trustees point to our sister circuit's decision in *LTV Steel Co. v. Shalala* (*In re Chateaugay II*), 53 F.3d 478 (2d Cir. 1995), but that decision is unpersuasive. There, the Second Circuit held that "Coal Act liability" for post-confirmation premiums "was not dischargeable in bankruptcy." *Id.* at 498. But our sister circuit failed to provide any rationale for its holding.

The Trustees posit that the holding of the Second Circuit turned on an unrelated conclusion that Coal Act premiums are

"taxes" that "accru[e]" when they are assessed and become due, *id.* (internal quotation marks omitted); *see also United Mine Workers of Am. 1992 Benefit Plan v. Rushton* (*In re Sunnyside Coal Co.*), 146 F.3d 1273, 1278 (10th Cir. 1998), but even so we are unpersuaded by that rationale for two reasons. First, a "'claim'"—a term defined broadly in the bankruptcy context—"include[s] a cause of action or right to payment that has not yet accrued or become cognizable." 2 COLLIER ON BANKRUPTCY ¶ 101.05[1] (16th ed. 2022); *see also* 11 U.S.C. § 101(5)(A); *Midland Funding*, 137 S. Ct. at 1412 (explaining that because "[t]he word 'enforceable' does not appear in the [Bankruptcy] Code's definition of 'claim,'" an "unenforceable claim is nonetheless a 'right to payment,' hence a 'claim,' as the [Bankruptcy] Code uses those terms"). Second, nothing in this appeal turns on whether the premiums are taxes. To be sure, many taxes arise periodically, and "claims," in the bankruptcy sense, for future taxes ordinarily do not exist before the debtor engages in the taxable conduct. But even if Coal Act obligations could be considered taxes, the companies' liability would turn solely on their pre-confirmation conduct. *See In re Chateaugay II*, 53 F.3d at 494 ("[T]he Coal Act . . . apportions future financial responsibility according to past participation" in the pre-Coal Act health-care system.). So, whether Coal Act premiums can be considered "taxes"— as *In re Chateaugay II* held—has no bearing on when claims for those premiums arise. *See* 11 U.S.C. § 503(b)(1)(B)(i).

*B. The Trustees' Claim Under Section 9711 and Resulting Claims for 1992 Plan Premiums Were Discharged in 1995.*

The remainder of this appeal concerns the companies' obligation to provide health-care benefits directly to retirees, *see* 26 U.S.C. § 9711(a), and to pay premiums to the 1992 Plan if the retirees do not receive benefits under section 9711, *see id.* § 9712(b)(2)(B), (d). The companies argue that both obligations were "claims" that existed and were discharged in 1995. We agree and discuss each obligation in turn.

1. The Trustees' Alleged Equitable Right to Compel the Companies to Provide Benefits Is a Claim Under Section 101(5)(B) That Existed and Was Discharged in 1995.

The Trustees' alleged right under section 9711 is a "claim." A creditor holds a "claim" when it has a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," 11 U.S.C. § 101(5)(B), and the Trustees held such a claim in 1995. When a covered entity breaches its obligation to provide health-care benefits to retirees under section 9711, the 1992 Plan provides those benefits instead and assesses the entity premiums commensurate with the costs of providing the benefits. *See* 26 U.S.C. § 9712(b)(2)(B), (d)(1)(A), (d)(2). The Trustees assert that such a breach occurred and seek an equitable remedy—specific performance of the companies' obligations under section 9711. Because the Trustees hold a right to an equitable remedy for breach of the companies' obligations under section 9711, and that breach

gives rise to a right to payment of premiums to the 1992 Plan, the Trustees' alleged right to specific performance is a "claim."

The Trustees' claim was discharged in 1995. Like with the claim for Combined Fund premiums, the Trustees and the companies had the requisite relationship, and the companies' liability under section 9711 is based solely on the companies' pre-confirmation conduct and was fixed in 1992. *See* 26 U.S.C. § 9711(a), (c)(1); *see also id.* § 9712(d)(1), (d)(4); *E. Enters.*, 524 U.S. at 537 (plurality opinion). As we have explained, it is immaterial that in 1995 the claim was not yet enforceable or that the *amount* of the 1992 Plan premiums was uncertain. Both those facts are irrelevant in determining whether the Trustees held a pre-confirmation "claim" under the Bankruptcy Code. *See Midland Funding*, 137 S. Ct. at 1412; 11 U.S.C. § 101(5)(B). The dissent argues that liability is based only "in part . . . on the companies' pre-confirmation conduct" and that the "crucial basis for . . . liability is the post-confirmation . . . breach" of performance. Dissenting Op. 8–9, 13, but the dissent confuses the existence of a liability with its enforceability. In 1995, the Trustees held a right to an equitable remedy for breach of performance—and so a claim within the meaning of the statute—and could enforce that right when a breach occurred. *Compare id.* at 6–7, 9 (citing *CPT Holdings, Inc. v. Indus. & Allied Emps. Union Pension Plan, Local 73*, 162 F.3d 405, 409 (6th Cir. 1998) (concluding that a creditor did not hold a right to payment under section 101(5)(A) because an "*enforceable* right to payment . . . may never" arise (emphasis added))), *with Midland Funding*, 137 S. Ct. at 1412

(explaining, in a decision postdating *CPT Holdings*, that an "unenforceable claim is nonetheless . . . a 'claim' . . . as the Code uses th[at] term[]").

The Trustees resist this conclusion and urge us to apply a test from the Seventh Circuit, first announced in *In re Udell*, for determining whether a right to an equitable remedy is a claim. *See* 18 F.3d 403, 408 (7th Cir. 1994); 11 U.S.C. § 101(5)(B). *Udell* held "that a right to an equitable remedy for breach of performance is a claim if the same breach also gives rise to a right to a payment *with respect to* the equitable remedy." *In re Udell*, 18 F.3d at 408 (emphasis added) (internal quotation marks omitted). Under that test, "the necessary relationship . . . exists" between the right to payment and the equitable remedy if, for example, "the right to payment is an *alternative* to the right to an equitable remedy." *Id.* (emphasis added) (internal quotation marks omitted). By contrast, the necessary relationship does not exist if the breach gives rise to a right to an equitable remedy *in addition to* the right to payment. *Id.* at 408–10. Applying the *Udell* test, the Trustees argue that their alleged right to compel compliance with section 9711 is not a claim because the obligation to pay premiums to the 1992 Plan is not an "alternative" to the obligation under section 9711.

We decline to adopt the *Udell* test. As both the *Udell* majority and concurrence acknowledged, the test that there be some close relationship between the equitable remedy and the right to payment conflicts with the text of section 101(5)(B). *Compare id.* at 408 ("recogniz[ing] the appealing simplicity of [the debtor's]

'plain language' reading of [section] 101(5)(B)" but rejecting that reading), *and id.* at 412 & n.5 (Flaum, J., concurring in the result) (agreeing with the majority opinion "that adding the word 'alternative' immediately before 'right'" in the statute "is necessary for th[e] statute to work in the real world"), *with CSX Corp. v. United States*, 18 F.4th 672, 680 (11th Cir. 2021) ("When the words of a statute are unambiguous, . . . judicial inquiry is complete." (internal quotation marks omitted)). *See also* Daniel J. Bussel, *Doing Equity in Bankruptcy*, 34 EMORY BANKR. DEV. J. 13, 42–43 (2017). Section 101(5)(B) directs us to consider only whether the same breach "gives rise" to both the right to an equitable remedy and a right to payment. 11 U.S.C. § 101(5)(B). And, as we have already explained, the Trustees' right to equitable relief is triggered by the same breach that gives rise to their right to payment of 1992 Plan premiums.

The Trustees and the dissent further suggest that even if the Trustees' right is a claim, that claim did not exist until Walter Energy ceased providing benefits in 2016. Dissenting Op. 6–7. But the text of the statute is unambiguous that a "right to an equitable remedy" can exist before a "breach of performance" occurs. *See* 11 U.S.C. § 101(5)(B) (explaining that "claim" includes "a right to an equitable remedy . . . *whether or not* such right . . . is reduced to judgment, fixed, contingent, matured, [or] unmatured" (emphasis added)). The dissent argues that the use of the word "'breach'" two times in section 101(5)(B) "suggest[s]" that a prior breach is "necessary for a claim." Dissenting Op. 12 But neither use of the word

"breach" in section 101(5)(B) references the timing of that breach; instead, section 101(5)(B) uses the word "breach" to make clear that the "right to an equitable remedy" and the "right to payment" must be connected by a common "breach of performance." *See* 11 U.S.C. § 101(5)(B) (defining "claim" as a "right to an equitable remedy for *breach* of performance if *such breach* gives rise to a right to payment" (emphases added)). And in the light of the plain meaning of the text of section 101(5)(B), it is irrelevant that section 101(5)(A) does not "contain[] the word 'breach.'" *Contra* Dissenting Op. 12–13.

Requiring a pre-confirmation breach would mean that debtors could only "deal[] with" "all [their] legal obligations . . . in the bankruptcy case" by waiting until preexisting obligations become due before filing for bankruptcy. *See In re Piper Aircraft*, 58 F.3d at 1576 (internal quotation marks omitted). But a "claim" can be discharged before performance becomes due, so long as the debtor's liability was incurred by pre-confirmation conduct. *See* 11 U.S.C. § 101(5)(B) (including rights to an equitable remedy that are "unmatured"); *cf. In re Stewart Foods*, 64 F.3d at 145–46 (explaining the "pernicious consequences" of requiring an obligation to be breached or to be enforceable before it can be discharged); *Midland Funding*, 137 S. Ct. at 1412 (rejecting the argument that "claim" is limited to "enforceable obligation[s]" (internal quotation marks omitted)). So, because the Trustees held a claim in 1995, that claim was discharged by the plan of reorganization.

20-13832            Opinion of the Court            23

The dissent attempts to insert a prior-breach requirement into section 101(5)(B) to "further[] the purposes of the . . . Code" by ensuring that the "claim . . . [is] suitable for bankruptcy," Dissenting Op. 10–11, but no addition is necessary or appropriate. *See Badgerow v. Walters*, 142 S. Ct. 1310, 1318 (2022) ("We have no warrant to redline [a statute]."). Requiring that the breach of performance also give rise to a right to payment ensures that a claim can be estimated in monetary terms even if that breach has not yet occurred. The dissent's added requirement would do nothing to "fulfill[] the purposes of the . . . Code," Dissenting Op. 11, but would contravene what we have said was Congress's intent that "all legal obligations of the debtor, no matter how remote or contingent[, are able to] be dealt with in . . . bankruptcy" if they fall within the statutory definition, *see Midwest Holding #7, LLC v. Anderson (In re Tanner Family, LLC)*, 556 F.3d 1194, 1197 (11th Cir. 2009) (internal quotation marks omitted) (explaining that this "intent" was "made clear" by the text). And, in any event, we are not at liberty to supplement an unambiguous provision like section 101(5)(B) to accommodate "even the most formidable policy arguments." *See BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532, 1542 (2021) (internal quotation marks omitted).

Because we hold that the Trustees' alleged right to specific performance is a "claim" within the meaning of section 101(5)(B), we need not address the companies' argument that the Trustees' right is an "equitable" "right to payment" under section 101(5)(A), too. *Cf. County of San Mateo v. Peabody Energy Corp. (In re*

*Peabody Energy Corp.*), 958 F.3d 717, 724 (8th Cir. 2020) (recognizing that equitable remedies are "often" no more than "orders" to make "payments" (alterations adopted) (internal quotation marks omitted)); *Home State Bank*, 501 U.S. at 83–84 (concluding that the equitable right to foreclose on real property is a claim under both section 101(5)(A) and 101(5)(B)). That is, we need not decide—as some of our sister circuits have concluded—whether a creditor that can enforce a debtor's obligation to make payments to a third party, such as an insurance company or health-care provider, holds a right to payment. *See In re Peabody Energy*, 958 F.3d at 725 ("[A] claim includes virtually all obligations to pay money, without regard to who receives the payment." (citation and internal quotation marks omitted)); *In re Altair Airlines, Inc.*, 727 F.2d 88, 90–91 (3d Cir. 1984) (holding that a collective bargaining agent held a claim even though the rights to payment the agent was authorized to enforce were held by workers and the payments would go to those workers). Nor need we decide whether the Coal Act allows covered entities to make payments directly to the retirees for their health-care expenditures or whether covered entities must pay an insurance company or health-care provider to provide those benefits to the retirees. *See, e.g.*, 26 U.S.C. § 9711(a) (imposing on certain companies the obligation to "continue to provide health benefits coverage" to covered retirees).

2. The Trustees' Claims for 1992 Plan Premiums Existed and
Were Discharged in 1995.

In the light of our earlier conclusions, we have little trouble concluding that all claims against the companies held by the Trustees for 1992 Plan premiums existed and were discharged in 1995. Liability to the 1992 Plan, including liability to provide a security payment and pay prefunding premiums, was fixed before 1995. To be sure, the total amount that would be owed to the 1992 Plan was uncertain. But that uncertainty means only that the Trustees' claims were "unliquidated" and required estimation, not that those claims did not exist. *See* 11 U.S.C. § 101(5)(A). In so holding, we join the many courts that have treated future Combined Fund and 1992 Plan premiums as similarly dischargeable in bankruptcy. *See, e.g.*, *Holland v. Westmoreland Coal Co.* (*In re Westmoreland Coal Co.*), 968 F.3d 526, 531, 536, 544 (5th Cir. 2020) (explaining that "all courts to consider the question have held that Coal Act obligations are subject to modification" and collecting cases); *In re Walter Energy*, 911 F.3d at 1157; *In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 326–28 (Bankr. E.D. Va. 2016); *In re Horizon Nat. Res. Co.*, 316 B.R. 268, 274–79 (Bankr. E.D. Ky. 2004); *see also In re Bethlehem Steel Corp.*, 2004 WL 601656, at *2 (Bankr. S.D.N.Y. Feb. 9, 2004) (cited in *In re Walter Energy*, 911 F.3d at 1145) (confirming a plan of reorganization in which the Trustees for the Fund and the Plan had voluntarily agreed "not to bring or maintain any legal action against" entities for premiums to the Combined Fund and 1992 Plan in exchange for an upfront payment).

## IV. CONCLUSION

We **REVERSE** the judgment in favor of the Trustees and **REMAND** for further proceedings consistent with this opinion.

20-13832  ANDERSON, J., Concurring in part & dissenting in part     1

ANDERSON, Circuit Judge, concurring in part & dissenting in part:

While I agree with the majority that the companies' liability for the Combined Fund premiums, 26 U.S.C. § 9704, was discharged, I do not agree with the majority that the companies' liability for maintaining an Individual Employer Plan, 26 U.S.C. § 9711, was discharged pursuant to 11 U.S.C. § 101(5)(B).[1]  Nor do I agree that the companies' liability for premiums to the 1992 Plan, 26 U.S.C. § 9712, was discharged.  Thus, I respectfully dissent to that extent.

## I.

As the majority notes, Congress enacted the Coal Act in 1993, converting "coal companies' contractual obligations to provide health care benefits to workers . . . into a statutory requirement." *United Mine Works of Am. Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1130 (11th Cir. 2018).  The companies here were related persons to a signatory operator, Jim Walter Resources,[2] as of July 20, 1992.  *See* 26 U.S.C. § 9701(c)(2).  The companies, then, are jointly and severally liable for the Coal Act obligations of the signatory operator.  *See* 26 U.S.C. §§ 9704(a), 9711(c), 9712(d)(4).

---

[1] Because the majority does not address 11 U.S.C. § 101(5)(A) with respect to this issue, I also do not.

[2] Jim Walter Resources was a subsidiary of Walter Industries.  After the 1995 bankruptcy, Walter Industries changed its name to Walter Energy.

2  ANDERSON, J., Concurring in part & dissenting in part  20-13832

The Coal Act created three obligations for signatory operators and their related persons.  First, the Coal Act requires the payment of premiums to the Combined Fund to provide health benefits to coal industry retirees and their families who, on July 20, 1992, were receiving "benefits from the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan."  26 U.S.C. § 9703(f).  Second, the Coal Act requires the maintenance of an Individual Employer Plan ("IEP") for those retirees who were receiving health benefits coverage through an IEP as of February 1, 1993.  26 U.S.C. § 9711.  Third, as relevant here, if a covered entity fails to maintain an IEP for those retirees, the Coal Act requires the payment of premiums to the 1992 Plan to cover the cost of providing health benefits to those retirees.  26 U.S.C. § 9712(b)(2)(B).

The companies, their parent company, and Jim Walter Resources all filed bankruptcy petitions in 1989.  The consolidated bankruptcy was confirmed in 1995.  As required by the confirmation plan, Walter Energy maintained an IEP and paid Combined Fund premiums as required by the Coal Act.  It did so until 2016.  No premiums were owed to the 1992 Plan until Walter Energy ceased maintaining its IEP in 2016.  Thereafter, the Trustees sued the companies, seeking compliance with the Coal Act in the form of Combined Fund premiums, maintenance of an IEP, and 1992 Plan premiums for the time during which the companies failed to maintain an IEP.  In turn, the companies filed an action in their original bankruptcy proceeding, arguing that all their Coal Act obligations were discharged in the 1995 bankruptcy confirmation.

20-13832 ANDERSON, J., Concurring in part & dissenting in part    3

A bankruptcy confirmation "discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). In turn, the Bankruptcy Code defines claim as:

> (A) right to payment, whether or not such right is re-duced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undis-puted, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of perfor-mance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, un-matured, disputed, undisputed, secured, or unse-cured.

11 U.S.C. § 101(5).

Applying this definition, I agree with the majority that the companies' liability to pay Combined Fund premiums was a claim when the Coal Act was enacted and thus was discharged by the companies' 1995 bankruptcy confirmation. However, the IEP ob-ligation was not a claim under § 101(5)(B) until 2016 and could not have been discharged in 1995. Similarly, the companies' liability for 1992 Plan premiums did not arise until 2016 and was not dis-charged in 1995.

II.

4   ANDERSON, J., Concurring in part & dissenting in part   20-13832

Before discussing my points of disagreement, I want to briefly explain why I agree that the companies' liability for Combined Fund premiums was discharged in 1995, which, I think, may be helpful in explaining my disagreement. After discussing that issue, I will discuss the IEP obligation and 1992 Plan premiums.

### A.  The Combined Fund Premiums

In our Circuit, we use the following two-part test for determining whether a claim arose before confirmation: (1) whether "events occurring before confirmation create a relationship . . . between the claimant and the debtor[]" and (2) whether the "basis for liability is the debtor's pre[-confirmation] conduct." *Epstein v. Off. Comm. of Unsecured Creditors of Est. of Piper Aircraft Corp.* (*In re Piper Aircraft, Corp.*), 58 F.3d 1573, 1577 (11th Cir. 1995).[3]  In other words, we require a pre-confirmation relationship and pre-confirmation conduct.

---

[3] Our decision in *In re Piper Aircraft* required a pre-confirmation relationship but *pre-petition conduct.* 58 F.3d at 1577. The district court had required a pre-petition relationship and pre-petition conduct. *Id.* In explaining why we modified the district court's test and "chang[ed] the focal point of the relationship from the petition date to the confirmation date," we noted that we were making the test "consistent with the policies underlying the Bankruptcy Code." *Id.* at 1577 n.5. That consistency should extend to the timing of the relevant conduct—i.e., pre-confirmation conduct should be required. *See Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012) (citing our decision in *In re Piper Aircraft* to alter its test to look for pre-confirmation instead of pre-petition conduct). Thus, I, like the majority, look for both a pre-confirmation relationship and pre-confirmation conduct here.

20-13832 ANDERSON, J., concurring in part & dissenting in part    5

The companies' status as related persons was determined based on their relationship with a signatory operator on July 20, 1992. *See* 26 U.S.C. § 9703(f). And the companies' liability for Combined Fund premiums was fixed on the Coal Act's effective date, February 1, 1993. *See* 26 U.S.C. § 9702(a)(2). As of that date, the Trustees and the companies had the requisite relationship. And the companies needed to engage in no further conduct for their liability for Combined Fund premiums to attach. While the Trustees right to payment was contingent because it was based on the lifespan of the retirees, the cost of health benefits, and the longevity of other signatory operators and their related persons, the Trustees had a right to payment for all future Combined Fund premiums as of 1993. *See* 26 U.S.C. § 9704(b). Because the companies' liability to pay Combined Fund premiums arose in 1993, I agree with the majority that it was discharged in the companies' 1995 bankruptcy confirmation pursuant to § 101(5)(A).

Two final points are worth mentioning. First, the Trustees' claim for Combined Fund premiums is a claim under § 101(5)(A)—i.e., it is a right to payment. Therefore, it is a claim without the necessity of a breach. *See Stewart Foods, Inc. v. Broecker* (*In re Stewart Foods, Inc.*), 64 F.3d 141, 146 (4th Cir. 1995) (finding that 101 future payments constituted a claim even though the payments were due after the bankruptcy). Second, I also agree with the majority that this appeal does not turn on an analogy to taxes. Majority Op. at 17. The Combined Fund premiums, even if considered taxes, are based solely on pre-confirmation conduct. *See Saint*

6  ANDERSON, J., Concurring in part & dissenting in part  20-13832

*Catherine Hosp. of Ind., LLC v. Ind. Fam. & Soc. Servs. Admin.*,
800 F.3d 312, 317 (7th Cir. 2015) (rejecting a similar analogy to taxes
because the liability was based entirely on pre-petition conduct).

## B.  *The Individual Employer Plan and 1992 Plan Premiums.*

Any possible claim pursuant to § 101(5)(B) that the Trustees
had to enforce the companies' IEP obligation did not arise until
2016.  Nor did any claim for 1992 Plan premium payments arise
until 2016.  Because a bankruptcy confirmation only "discharges
the debtor from any debt that arose before confirmation," 11
U.S.C. § 1141(d)(1)(A), neither of those claims was discharged in
the 1995 bankruptcy.  I will first address the IEP obligation and then
discuss the 1992 Plan premiums.

The Coal Act requires covered entities and their related per-
sons to "continue to provide health benefits coverage . . . which is
substantially the same as . . . the coverage provided by such plan as
of January 1, 1992" to any retiree and the retiree's eligible benefi-
ciaries who were receiving such coverage as of February 1, 1993.
26 U.S.C. § 9711(a).  The majority argues that the Trustees had a
claim with respect to the companies' IEP obligation under
§ 101(5)(B) and that the claim existed in 1995.  Majority Op. at 18–
19.  I respectfully believe that this view misunderstands when a
claim arises under § 101(5)(B).

A creditor holds a claim under § 101(5)(B) when it has "a
right to an equitable remedy for breach of performance if such

20-13832 ANDERSON, J., Concurring in part & dissenting in part    7

breach gives rise to a right to payment." Before there is a "breach of performance" by the debtor, the creditor can have no "right to an equitable remedy." This is the same reasoning the Sixth Circuit employed when it determined that for ERISA withdrawal liability, no right to payment existed "until an employer actually withdraws from a plan." *CPT Holdings, Inc. v. Indus. & Allied Emps. Union Pension Plan, Local 73*, 162 F.3d 405, 409 (6th Cir. 1998). The reasoning of the Sixth Circuit is persuasive. Just as a right to payment for statutory damages cannot exist until the statute is violated, a right to an equitable remedy for breach of performance cannot exist until there is a breach of performance. Since the relevant breach occurred in 2016 when Walter Energy and the companies failed to maintain an IEP, the claim arising out of that breach cannot have been discharged in 1995.

The majority argues that it does not matter whether the Trustees' right to an equitable remedy was enforceable in 1995. Majority Op. at 19–20. That is true. But the relevant question is whether there existed as of 1995 a "right to an equitable remedy for breach of performance." 11 U.S.C. § 101(5)(B). The majority's focus on the Supreme Court's decision in *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407 (2017) is, thus, misplaced. There, the Court determined that a creditor had a right to payment of a debt even though the statute of limitations had expired, making the right to payment unenforceable. *Id.* at 1411. In other words, *Midland Funding* dealt with the judicial enforceability of a right to payment that already existed. Here, the question is when the right to

8  ANDERSON, J., Concurring in part & dissenting in part  20-13832

an equitable remedy for breach of performance arises. The Supreme Court's decision in *Midland Funding* sheds no light on that question. And because there was no breach of performance until 2016, the Trustees' right to an equitable remedy for breach of performance simply did not exist in 1995.

The majority contends that a claim under § 101(5)(B) can exist before a breach occurs "so long as the debtor's liability was incurred by pre-confirmation conduct." Majority Op. at 22. I submit that the majority misunderstands what conduct gives rise to the claim here. The majority seems to believe that the passage of the Coal Act or the date of determination of related persons or possibly the signing of the national wage agreements is the relevant conduct. But the crucial conduct which gives rise to the basis for the companies' liability is the breach of the IEP obligation. Because the Trustees' hold a claim only because the breach (failure to maintain the IEP) gives rise to a right to payment (1992 Plan premiums), the relevant conduct giving rise to the claim is the companies' breach of their IEP obligation. This was post-confirmation conduct. Thus, the Trustees' claim arising from the companies' post-confirmation conduct could not have been discharged in the 1995 bankruptcy. And while the majority may argue that the right to payment is merely contingent, a debtor's own future conduct cannot make a claim contingent. *See Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 532–33 (9th Cir. 1998) ("A contingent claim is 'one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger

20-13832 ANDERSON, J., Concurring in part & dissenting in part    9

the liability of the debtor to the alleged creditor.'" (quoting *Fostvedt v. Dow* (*In re Fostvedt*), 823 F.2d 305, 306 (9th Cir. 1987))).

One could argue against this reading of the statute because IEP liability here will be based, in part, on the companies' pre-confirmation conduct. But while Coal Act liability attaches to companies based on their pre-confirmation conduct, *E. Enters. v. Apfel*, 524 U.S. 498, 537, 118 S. Ct. 2131, 2153 (1998) (plurality opinion), holding the debtor liable (notwithstanding bankruptcy) for claims that are based in part on pre-confirmation conduct does not offend the Bankruptcy Code if, as here, the claim arises because of post-confirmation conduct, *CPT Holdings*, 162 F.3d at 406–09 (holding that a company's ERISA withdrawal liability could be based, in part, on its pre-confirmation participation in and contributions to a multiemployer plan because the Plan's claim did not arise until the company's post-confirmation conduct of actually withdrawing from the plan). In binding precedent, we too have held that confirmation does not discharge a debtor from liability based on post-confirmation conduct, even though pre-confirmation conduct—i.e., agreeing to the contract—was also essential for liability to attach. *See Shure v. Vermont* (*In re Sure-Snap Corp.*), 983 F.2d 1015, 1018 (11th Cir. 1993). Similarly, the Sixth Circuit found that it was permissible to base a reorganized debtor's contribution rate to Michigan's employment security fund on that debtor's pre-confirmation contribution history. *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1136 (6th

10   ANDERSON, J., Concurring in part & dissenting in part   20-13832

Cir. 1991).   Therefore, even though the companies' pre-confirmation conduct may contribute to their liability, a claim that depends in part on that conduct is not discharged if it arises because of post-confirmation conduct.   Bankruptcy confirmation does not absolve a company of all pre-confirmation conduct.   *See In re Piper Aircraft*, 58 F.3d at 1577 (finding that a claim had not arisen because, despite pre-confirmation conduct, there was no pre-confirmation relationship, thus necessarily allowing for a future claim based on that pre-confirmation conduct).   Instead, bankruptcy confirmation discharges claims that arose before confirmation, but not claims that arose after confirmation.   And because the companies' post-confirmation 2016 breach of performance—i.e., failure to maintain an IEP—gives rise to the Trustees' claim, the Trustees did not have a claim in 1995 with respect to the companies' IEP obligation.

Requiring a breach for a claim to arise under § 101(5)(B) is critical to furthering the purposes of the Bankruptcy Code.   Bankruptcy allows a debtor a "financial 'fresh start'" by resolving all claims against the debtor in the same bankruptcy.   *See Owaski v. Jet Fla. Sys., Inc.* (*In re Jet Fla. Sys., Inc.*), 883 F.2d 970, 972 (11th Cir. 1989) (quoting Thomas H. Jackson, *The Fresh-Start Policy in Bankruptcy Law*, 98 Harv. L. Rev. 1393, 1396–97 (1985)).   By forcing all present claimants into the bankruptcy, the Bankruptcy Code "facilitate[s] the prime bankruptcy policy of equality of distribution among creditors."   *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S. Ct. 527, 533 (1991) (quoting H.R. Rep. No. 95-595, at 177–78 (1977)).   In essence, bankruptcy collects all claims against a debtor

20-13832 ANDERSON, J., concurring in part & dissenting in part    11

and divides the debtor's available resources among those claims. Therefore, it is essential that for any claim to be dischargeable in bankruptcy, it must be able to be represented by money damages. Under § 101(5)(B), if the relevant breach does not give rise to a right to payment, the equitable remedy is not a claim because it is irrelevant to providing a financial fresh start to the debtor and equitable distribution to the creditors. And where a breach does give rise to a right to payment, the breach is necessary for a claim to arise under § 101(5)(B) because the breach and related right to payment are what allow the claim to be suitable for bankruptcy. Thus, requiring a breach before a claim arises under § 101(5)(B) fulfills the purposes of the Bankruptcy Code.

Moreover, requiring such a breach ensures that the essential element of a bankruptcy claim—a right to payment—exists before discharge. Under § 101(5)(B), a breach must give rise to a right to payment for a right to an equitable remedy to be a claim. It is the right to payment that allows the supposed claim to be suitable for bankruptcy—i.e., provides a financial fresh start to the debtor and equitable distribution to creditors. Therefore, a right to payment is the key feature of any bankruptcy claim. *See* 11 U.S.C. § 101(5)(A) (defining claim as a "right to payment); *Id.* § 101(5)(B) (defining claim to include a "right to an equitable remedy for breach of performance if such breach of performance gives rise to a *right to payment*" (emphasis added)). Allowing a discharge when no right to payment exists contravenes the purpose and text of the Bankruptcy Code.

12  ANDERSON, J., Concurring in part & dissenting in part  20-13832

Most significantly, requiring a pre-confirmation breach is faithful to the statutory text. The text of § 101(5)(B) contains the word "breach" twice, suggesting it is necessary for a claim. One could argue that § 101(5)(B) does not explicitly require a breach to occur before confirmation. But § 101(5)(B) defines claim for the entire Bankruptcy Code. Other provisions of the code discuss the relevance of timing. As noted above, § 1141(d)(1)(A) provides that confirmation "discharges the debtor from any debt that arose before the date of such confirmation." Recall that "[t]he term 'debt' means liability on a claim," 11 U.S.C. § 101(12), so that the definitions of debt and claim are coextensive. Similarly, the Bankruptcy Code's section on administrative expenses provides that taxes "incurred by the estate" are an allowed administrative expense. 11 U.S.C. § 503(b)(1)(B). The Bankruptcy Code also provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552. The Bankruptcy Code's substantive provisions are riddled with delineations based on timing that impact how different claims are handled. The natural and plausible meaning of § 101(5)(B)—"right to an equitable remedy for breach of performance if such breach gives rise to a right to payment"—is that the existence of a claim depends upon there being a breach of performance. And § 1141(d)(1)(A)—providing that a claim must arise before the date of confirmation—means that the breach of performance must arise—i.e., occur—before confirmation. And this plain meaning is bolstered by the contrast to

20-13832 ANDERSON, J., Concurring in part & dissenting in part    13

§ 101(5)(A), which neither contains the word "breach" nor requires a breach.  *See In re Stewart Foods*, 64 F.3d at 146.

It also seems to me that the majority's position is in tension with the established law that a bankruptcy confirmation plan does not discharge claims that arise on account of post-confirmation conduct of the debtor.  *See* 8 Collier on Bankruptcy ¶ 1141.05 ("The discharge operates on all claims that arose before the date of confirmation."); *In re Piper Aircraft*, 58 F.3d at 1577 (holding that one prerequisite for discharge is that the "basis for liability" of the debtor be the debtor's pre-confirmation conduct); *In re Sure-Snap*, 983 F.2d at 1018 (holding that there was no discharge where the basis for the liability of the debtor was the debtor's post-confirmation conduct).  As noted above, although there was pre-confirmation conduct on the part of Walter Energy and the companies, it seems clear to me that the crucial basis for the liability is the post-confirmation 2016 breach of the obligation to maintain an IEP.  That post-confirmation breach gave rise to any claim the Trustees' have with respect to the companies' IEP obligation.  Because that breach occurred in 2016, the companies' 1995 bankruptcy confirmation could not discharge the Trustees' claim arising from it.  As a result, the Trustees' claim with respect to the companies' IEP obligation was not discharged in 1995 pursuant to § 101(5)(B).[4]

---

[4] I note that neither the companies nor the majority point to a case holding that a claim was discharged under § 101(5)(B) in the absence of a pre-confirmation breach of performance.

14  ANDERSON, J., Concurring in part & dissenting in part  20-13832

After determining that the companies' IEP obligation was not discharged in 1995, it is straightforward to conclude that their liability for 1992 Plan premiums was also not discharged. In 2016, when Walter Energy ceased maintaining its IEP and the companies declined to do so themselves, both Walter Energy and the companies here breached their IEP obligation under 26 U.S.C. § 9711. Thus, the companies' 2016 breach—i.e., post-confirmation conduct—gave rise to the companies' liability to pay 1992 Plan premiums under § 9712. Therefore, the Trustees' claim against the companies for 1992 Plan premiums also arose in 2016. Because that claim did not arise until 2016, it was not discharged in 1995. The existence of security or prefunding requirements, Majority Op. at 25, do not alter this conclusion. While those requirements arose pre-confirmation, the 1992 Plan premiums at issue here arose because of the companies' breach of their IEP obligation. Because the companies' obligation to pay 1992 Plan premiums arose based on post-confirmation conduct, it was not discharged in the bankruptcy confirmation.

While the majority notes that courts "have treated Combined Fund and 1992 Plan premiums as similarly dischargeable in bankruptcy," Majority Op. at 25, my conclusion is not at odds with those decisions. The Trustees' claim for Combined Fund premiums arose in 1993 and was discharged in 1995, but the Trustees' claim for 1992 Plan premiums did not arise until 2016. Therefore, instead of being at odds with those decisions, my view merely requires that for those premiums to be discharged, they must "ar[i]se

20-13832 ANDERSON, J., Concurring in part & dissenting in part    15

before the date of [bankruptcy] confirmation." 11 U.S.C. § 1141(d)(1)(A). Because the Trustees' claim for 1992 Plan premiums did not do so, it was not discharged.

### III.

While I agree with the majority that the Trustees' claim for Combined Fund premiums was discharged in 1995, I disagree with the majority's holding that the 1995 confirmation also discharged the companies' IEP obligation under § 101(5)(B) and the companies' liability for 1992 Plan premiums. Respectfully, I dissent to that extent.